# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-1330

_____

| | |
|---|---|
| Blomkest Fertilizer, Inc.; Cobden Grain & Feed, on behalf of themselves and all others similarly situated; | * <br> * <br> * <br> * |
| Plaintiffs, | * <br> * |
| Hahnaman Albrecht, Inc.; John Peterson, doing business as Almelund Feed & Grain; Laing-Gro Fertilizers, Inc.; | * <br> * <br> * <br> * <br> * |
| Plaintiffs-Appellants, | * <br> * |
| | *    Appeal from the United States |
| Clearbrook Ag Service, Inc., on behalf of itself and all others similarly situated; Reamford Liquid Fertilizer, Inc., on behalf of itself and all others similarly situated; Tolley's Inc., on behalf of itself and all others similarly situated; | *    District Court for the District <br> *    of Minnesota. <br> * <br> * <br> * <br> * <br> * |
| Plaintiffs, | * <br> * |
| James River Farm Service, Inc., on behalf of itself and all others similarly situated; | * <br> * <br> * <br> * |
| Plaintiffs-Appellants, | * <br> * |
| Angela Coleman, on behalf of herself and all others similarly situated; | * <br> * <br> * |
| Plaintiffs, | * |

Ag Network, Inc.;

   Plaintiffs-Appellants

Marcelline Farm Supply, Inc., on behalf of itself and all others similarly situated;

   Plaintiffs,

   v.

Potash Corporation of Saskatchewan, Inc.; Potash Corporation of Saskatchewan Sales, Inc.; Potash Company of America, Inc.; IMC Fertilizer Group, Inc.; Kalium Chemicals, Ltd.; Kalium Canada, Ltd.; Noranda Minerals, Inc.; Central Canada Potash Co.; Noranda Sales Corporation, Ltd.; Cominco, Ltd.; Cominco American, Inc.; Eddy Potash, Inc.; New Mexico Potash Corporation;

   Defendants-Appellees,

Rio Algom, Ltd.;

   Defendants,

PPG Canada, Limited; PPG Industries, Inc.; IMC Global;

   Defendants-Appellees.

_____

Submitted: September 13, 1999
Filed:  February 17, 2000
_____

Before WOLLMAN, Chief Judge, HEANEY, MCMILLIAN, R. ARNOLD, JOHN R. GIBSON, BOWMAN, BEAM, LOKEN, HANSEN, M. ARNOLD, and MURPHY, Circuit Judges.

_____

BEAM, Circuit Judge.

A certified class of potash consumers appeals the district court's[1] grant of summary judgment in favor of defendants (collectively "the producers")  in this action for conspiracy in restraint of trade under section 1 of the Sherman Act.  We affirm.

## I.    BACKGROUND

This case involves the production and sale of potash, a mineral essential to plant growth and therefore used in fertilizer.  The certified class includes all of those persons who directly purchased potash from one of the producers between April 1987 and July 1994.  The class named six Canadian potash companies and two American companies.[2]

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the Honorable Raymond L. Erickson, United States Magistrate Judge for the District of Minnesota.

[2](1) Potash Corporation of Saskatchewan, Inc. and Potash Corporation of Saskatchewan Sales, Ltd. (collectively "PCS"); (2) Cominco, Ltd. and Cominco American, Inc. (collectively "Cominco"); (3) IMC Global, Inc.; (4) Kalium Chemicals, Ltd., Kalium Canada, Ltd. and its former owner and operator, PPG Industries, Inc. and PPG Canada, Ltd. (collectively "Kalium"); (5) Noranda Mineral, Inc., Noranda Sales Corporation Ltd. and Central Canada Potash Co. (collectively "Noranda"); (6) Potash

Both parties agree that the North American potash industry is an oligopoly.[3] Prices in an oligopolistic market tend to be higher than those in purely competitive markets, and will fluctuate independently of supply and demand. See Enrico Adriano Raffaelli, Oligopolies and Antitrust Law, 19 Fordham Int'l. L. J. 915, 916 (1996). Furthermore, "price uniformity is normal in a market with few sellers and homogeneous products." E.I. Du Pont De Nemours & Co. v. Federal Trade Comm'n, 729 F.2d 128, 139 (2d Cir. 1984). This is because all producers in an oligopoly must charge roughly the same price or risk losing market share.

The Canadian province of Saskatchewan is the source of most potash consumed in the United States. The province founded defendant Potash Corporation of Saskatchewan (PCS), which holds thirty-eight percent of the North American potash production capacity. As a governmental company, PCS had no mandate to maximize profits and was not accountable to private owners. Instead, the company was primarily concerned with maintaining employment and generating money for the local economy. Not surprisingly, PCS suffered huge losses as it mined potash in quantities that far outstripped global demand. These policies impacted the entire potash industry: during the 1980's, the price of potash fell to an historic low. In 1986, Saskatchewan voters elected a provincial government which had promised to privatize PCS. New management was appointed to PCS after the elections. Thereafter, PCS significantly reduced its output and raised its prices.

---

Corporation of America, Inc. and its owner Rio Algom, Ltd. (collectively "PCA"); (7) New Mexico Potash Corporation (NMPC) and its affiliate, (8) Eddy Potash Inc. (Eddy).

[3]An oligopoly is an "[e]conomic condition where only a few companies sell substantially similar or standardized products." Black's Law Dictionary 1086 (6th ed. 1990).

Also in 1986, New Mexico Potash Corporation (NMPC) and another American potash producer (who is not a named defendant) filed a complaint with the United States Department of Commerce. Frustrated with low potash prices, the petitioners alleged that Canadian producers had been dumping their product in the United States at prices below fair market value. In 1987, the Department issued a preliminary determination that the Canadian producers were dumping potash and ordered the companies to post bonds on all exports to the United States. These bonds were set according to each firm's calculated "dumping margin."[4] Eventually, the Department negotiated a Suspension Agreement with each of the Canadian producers. The agreement raised the price of Canadian potash in the United States by setting a minimum price at which each Canadian producer could sell in the United States.[5] That agreement remains in effect today. When the Canadian producers entered into the Suspension Agreement, PCS announced that it was raising its prices by eighteen dollars per ton. Other producers quickly followed suit. The price of potash has remained markedly higher after the Suspension Agreement, although prices have slowly but steadily declined for the most part since the agreement was signed by the producers on January 8, 1988.

The class alleges that between April 1987 and July 1994 the producers colluded to increase the price of potash. The producers, in turn, maintain that the price increase was the product of the interdependent nature of the industry and its reaction to the privatization of PCS and the Suspension Agreement. The district court granted the producers's motions for summary judgment and the class appeals.

---

[4]The dumping margin was calculated by the Department based on a comparison of the United States sale price, foreign market value, and cost of production for each producer.

[5]Under the agreement, each firm could sell potash in the United States at less than fair market value by an amount equal to 15% of its preliminary dumping margin.

## II.  DISCUSSION

The class asserts that if we affirm the district court, we will "stand alone in holding that circumstantial evidence, even if overwhelming, cannot be used to defeat a summary judgment motion in anti-trust cases." We make no such legal history here, however, because the class's proffered evidence, far from overwhelming, fails to establish the elements of a prima facie case.

Section 1 prohibits concerted action by two or more parties in restraint of trade. 15 U.S.C. § 1. The Supreme Court in Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 & 768 (1984) and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986), provided the standard used to determine whether the plaintiffs's evidence of a section 1 violation survives a summary judgment motion. In order to state a section 1 case, plaintiffs must present evidence that "tends to exclude the possibility of independent action" by the defendants. Monsanto, 465 U.S. at 768. This means that conduct that is "as consistent with permissible [activity] as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588. We are among the majority of circuits to apply Monsanto and Matsushita, broadly, and in both horizontal and vertical price fixing cases. See The Corner Pocket of Sioux Falls, Inc. v. Video Lottery Tech., Inc., 123 F.3d 1107, 1109 (8th Cir. 1997), cert. denied, 118 S. Ct. 1054 (1998). Applied in this case, the standard requires that if it is as reasonable to infer from the evidence a price-fixing conspiracy as it is to infer permissible activity, then the plaintiffs's claim, without more, fails on summary judgment.

The class's price-fixing claim is based on a theory of conscious parallelism. Conscious parallelism is the process "not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209,

227 (1993). The class points out that the producers's prices were roughly equivalent during the alleged conspiracy, despite differing production costs. It further points out that price changes by one producer were quickly met by the others. This establishes only that the producers consciously paralleled each other's prices.

Evidence that a business consciously met the pricing of its competitors does not prove a violation of the antitrust laws. See Theatre Enter., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540-41 (1954). Particularly when the product in question is fungible, as potash is, courts have noted that parallel pricing lacks probative significance. See Bendix Corp. v. Balax, Inc., 471 F.2d 149, 160 (7th Cir. 1972). An agreement is properly inferred from conscious parallelism only when certain "plus factors" exist. See In re Baby Food Antitrust Litigation, 166 F.3d 112, 122 (3d Cir. 1999); see, e.g., Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 884 (8th Cir. 1978) (requiring evidence that defendant acted contrary to self-interest in addition to evidence of conscious parallelism to establish antitrust violation). A plus factor refers to "'the additional facts or factors required to be proved as a prerequisite to finding that parallel [price] action amounts to a conspiracy.'" In re Baby Food, 166 F.3d at 122 (quoting 6 Phillip E. Areeda, Antitrust Law § 1433(e) (1986)).

A plaintiff has the burden to present evidence of consciously paralleled pricing *supplemented with* one or more plus factors. See Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1456 n.30 (11th Cir. 1991). However, even if a plaintiff carries its initial burden, a court must still find, based upon all the evidence before it, that the plaintiff's evidence tends to exclude the possibility of independent action. See Monsanto, 465 U.S. at 764 & 768; Matsushita, 475 U.S. at 588; see also In re Baby Food, 166 F.3d at 122. As noted, the class identified parallel pricing. The class also asserts that it has established the existence of three plus factors: (1) interfirm communications between the producers; (2) the producers's acts against self-interest; and (3) econometric models which purport to prove that the price of potash would have

-7-

been substantially lower in the absence of collusion. The evidence underlying these assertions, however, does not bear the weight the class places upon it.

## A.    Interfirm Communications

The class alleges a high level of interfirm communications between the producers and complains most vociferously about price verification information. Courts have held that a high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy. See, e.g., In re Plywood Antitrust Litigation, 655 F.2d 627, 633-34 (5th Cir. Unit A Sept. 1981). However, the evidence presented by the class here is far too ambiguous to support such an inference. Considering the proof as a whole, the evidence of interfirm communications does not tend to exclude the possibility of independent action, as required under Monsanto and Matsushita, since other significant events strongly suggest independent behavior. The fundamental difficulty with the class's argument regarding price verifications is that it assumes a conspiracy first, and then sets out to "prove" it. However, a litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly.

The class's evidence shows that the communications include meetings at trade shows and conventions, price verification calls, discussions regarding a Canadian potash export association, and the like. Taking the class's evidence as true, roughly three dozen price verifications occurred between employees, including high-level sales employees, of different companies, over at least a seven-year period. In large part, these contacts involved the verification of prices the companies had already charged on particular sales. The impotence of this circumstantial evidence is that it bears no relationship to the price increases most in question because it lacks the logical link necessary to infer such a relationship.

The class alleges that the price-fixing conspiracy began "at least as early as April, 1987." Complaint at 11. In 1987, the price for potash was at historically low levels, such that producers were losing millions of dollars. Then, a sudden and dramatic increase in price by PCS occurred on September 4, 1987, and approximately a week later the remaining producers followed suit.[6] The class argues that the large and parallel price increases together with nearly simultaneous price verifications create an inference sufficient to survive summary judgment.

The problem with this theory, as indicated, is that the price verification communications only concerned charges on particular completed sales, not future market prices. There is no evidence to support the inference that the verifications had an impact on price increases. The only evidence is that prices were possibly cut as a result. "[T]o survive summary judgment, there must be evidence that the exchanges of information had an impact on pricing decisions." In re Baby Food, 166 F.3d at 125 (citing Krehl v. Baskin-Robbins Ice Cream Co., 664 F.2d 1348, 1357 (9th Cir. 1982)). There is no evidence here that price increases resulted from any price verification or any specific communication of any kind. *Subsequent* price verification evidence on particular sales cannot support a conspiracy for the setting of a broad market price on September 4, 1987.

Even if we were to find the price verification evidence relevant, when considered with all the facts, it does not tend to exclude the possibility of independent action. To the contrary, there is strong evidence of independent action. Just before and concurrent with the suspect price increases, the following occurred: the price of potash was at historic lows and the producers were losing millions; potash companies in the United

---

[6]This price increase was rescinded in the wake of the Suspension Agreement. In its place came a much smaller increase by PCS on January 11, 1988–three days after the Suspension Agreement created a price floor–which pricing decision was followed thereafter by the remaining producers.

States complained to the United States Department of Commerce that the Canadian producers were dumping potash at well-below market value; the Department of Commerce made a preliminary determination that the Canadian producers were dumping and required expensive bonds for all imports; the industry leader, the government-founded PCS, hired new management and began privatization with the goal of becoming profitable; legislation was passed in the province of Saskatchewan–the source of nearly all United States potash–that provided for the setting and prorating of potash production; potash producers reached a Suspension Agreement with the Department of Commerce that set price floors for potash; and PCS was finally privatized and significantly reduced its output. In the face of these circumstances and with the price leadership of PCS in this oligopolistic industry, it would have been ridiculous for the remaining companies to not also raise their prices in a parallel fashion. Thus, we find the class's weak circumstantial evidence that the dramatic increases were the result of a price-fixing agreement is not sufficient to survive summary judgment.

This leaves only the question whether there is sufficient evidence to support an agreement to stabilize and maintain prices in violation of section 1 of the Sherman Act. The class's evidence of an agreement to maintain the price of potash at an artificially high level after the initial price increases is again the parallel pricing and price verifications. Parallel pricing has been conceded, leaving the burden once again on the verifications. Common sense dictates that a conspiracy to fix a price would involve one company communicating with another company *before* the price quotation to the customer. Here, however, the class's evidence consists solely of communications to verify a price on a *completed* sale. The price verifications relied upon were sporadic and testimony suggests that price verifications were not always given. The fact that there were several dozen communications is not so significant considering the communications occurred over at least a seven-year period in which there would have been tens of thousands of transactions. Furthermore, one would expect companies to verify prices considering that this is an oligopolistic industry and accounts are often

very large. We find the evidence falls far short of excluding the possibility of independent action.

In re Baby Food, 166 F.3d at 112, aptly illustrates why the communications complained about here are inadequate to exclude the possibility of independent action by the producers. The defendants, nationally prominent corporations with ninety-eight percent of the baby food business, were Gerber, H.J. Heinz, and Beech-Nut. It is true that the numerous intercompany pricing communications found by the Third Circuit to be *insufficient* to support a section 1 violation were characterized in one part of the opinion as price discussions among low-level employees. See id. at 125. However, deposition testimony in that case revealed that district sales employees and district sales managers of Heinz "were required to submit competitive activity reports to their superiors concerning baby food sales from information they picked up from competitor sales representatives." Id. at 118-19. This same line of testimony revealed that supervising managers for Heinz informed district managers "on a regular basis before any announcement to the trade as to when Heinz's competitors were going to increase [their] wholesale list prices." Id. at 119. The president of Beech-Nut "testified that it was [Beech-Nut's] policy for sales representatives to gather *and report* pricing information of [Beech-Nut's] competitors." Id. (emphasis added). Indeed, the In re Baby Food case is replete with evidence that pricing information was systematically obtained and directed to high-level executives of Gerber (including Gerber's vice president of sales), Beech-Nut and Heinz, the principal national competitors in the baby food industry.

The evidence in the case shows that a carefully conceived and effective system of price information gathering for the benefit of corporate executives was at all relevant times alive and well in the baby food industry. Notwithstanding communications that far surpassed any information exchanges established in this case, the Third Circuit applied Matsushita and granted summary judgment to the defendants, in large part because there was no evidence that the exchanges of information had an impact on

-11-

pricing decisions.  See In re Baby Food, 166 F.3d at 125.  As earlier stated, there likewise is absolutely no such evidence in this litigation, only speculation.

The class directs our attention to In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599, 614 (7th Cir.), cert. denied, 118 S. Ct. 1178 (1998), in which the plaintiffs, like the class, searched through an enormous quantity of discovery material and culled out a number of suspicious interfirm communications.  The court in Brand Name described these documents produced as "smoking guns."  Id.  By contrast, the communications here are facially innocent contacts which are, at most, ambiguous on the question of whether the producers schemed to set prices.

The class argues that a memorandum issued by Canpotex, a lawful Canadian cartel that sets prices for potash sold outside of the United States, is the class's "smoking gun."  This memorandum, dated January 8, 1988, and directed to its "agents and offices" reads in pertinent part:

> FYI Canadian potash producers have reached agreement with the United States Department of Commerce and all dumping action has been suspended for  minimum 5 years.  It is rumoured that the USD 35.00 per metric ton increase posted by Canadian producers in 1987 to cover possible tariff payments to the U.S. Govt will be refunded in full or part.  In the meantime new price lists are being issued on Monday Jan. 11 at:
>
> | Standard Grade | USD 80.00 |
> | Coarse Grade | USD 84.00 |
> | Granular Grade | USD 86.00 |

Appellants's Joint App. at 910.

The class asserts that this memorandum establishes an agreement to fix prices. The class argues that the people who received the January 8, 1988, memorandum were

-12-

all high-ranking officials in the producers's companies who were on the Board of Directors of Canpotex, and therefore, the memorandum is evidence that tends to exclude an inference that the producers acted independently.

The magistrate judge disagreed that this memorandum was sufficient evidence to exclude the possibility that the producers acted independently. The magistrate judge first noted that PCS had also announced the same prices in a telex to its customers on January 8, 1988, and thus the possibility that Canpotex learned of the price list from a customer of PCS could not be excluded. In re Potash Antitrust Litigation, 954 F. Supp. 1334, 1366 (D. Minn. 1997). Further, the magistrate judge discovered that while most of the Canadian defendants had matched the prices in the memorandum by January 22, 1988, they did not uniformly issue price lists matching those prices on January 11, 1988, and one producer, Kalium, did not match those prices at all. See id. However, as the magistrate judge pointed out, "evidence that the alleged conspirators were aware of each other's prices, before announcing their own prices, 'is nothing more than a restatement of conscious parallelism,' which is not enough to show an antitrust conspiracy." Id. (quoting Market Force Inc. v. Wauwatosa Realty Co., 906 F.2d 1167, 1172 (7th Cir. 1990)). See also Weit v. Continental Ill. Nat'l Bank and Trust Co., 641 F.2d 457, 462 (7th Cir. 1981) (mere opportunity to conspire even in context of parallel business conduct not necessarily probative evidence of price-fixing conspiracy).

We agree with the magistrate judge's finding that this document was not sufficient evidence to exclude an inference that the producers acted independently. First, the memorandum was written by R.J. Ford and directed to "agents and offices." Appellants's Joint App. at 910. It is not at all clear who this memorandum was sent to or received by, and a thorough review of the appellants's voluminous joint appendix has not clarified this point. Dozens of these high ranking officials were deposed during pretrial discovery, and according to the documents submitted by the class in its joint appendix, only one person, Dave Benusa, was asked if he received "any document dated the 8th of January 1988 concerning pricing." Appellants's Joint App. at 970.

Benusa was manager of marketing for Cominco American in 1988. Benusa stated in his deposition that he did not receive any document dated January 8, 1988, concerning pricing. The class apparently did not depose the author of the memorandum, R.J. Ford, nor did they make any further attempt that we can find to identify who received this "smoking gun" piece of evidence. Another document produced by Canpotex, an inter-office memorandum dated September 8, 1993, is actually directed to "Members of the Board of Directors of Canpotex Limited." Appellants's Joint App. at 911. We assume that had the January 8, 1988, memorandum been intended for the members of the board of directors, it likewise would have so stated.

Furthermore, even if, as the class asserts, the memorandum had been received by high-ranking officials in the producers's companies, we agree with the magistrate judge's reasoning that the memorandum does not assist the class in proving the existence of a conspiracy. As the magistrate judge pointed out, the producers did not uniformly increase prices to match the memorandum on January 11, 1988, and furthermore, one producer, Kalium, did not match the memorandum price at all. The fact that most of the producers did increase prices to match the PCS price increase of January 11, 1988, is not surprising in a market where conscious parallelism is the norm. Despite submitting a five-volume joint appendix, the class has failed to present evidence about this memorandum which tends to exclude the possibility of independent action by the producers. As it turns out, the "smoke" from this gun is barely, if at all, discernible.

Finally, the class asserts that the producers signaled pricing intentions to each other through advance price announcements and price lists. The Supreme Court has held, however, that "the dissemination of price information is not itself a per se violation of the Sherman Act." United States v. Citizens & S. Nat'l Bank, 422 U.S. 86, 113 (1975).

As we noted at the outset, the class may not proceed by first assuming a conspiracy and then setting out to prove it. If the class were to present independent evidence tending to exclude an inference that the producers acted independently, then, and only then, could it use these communications for whatever additional evidence of conspiracy they may provide. As the record stands, we find these contacts far too ambiguous to defeat summary judgment. See The Corner Pocket, 123 F.3d at 1112.

### B.    Actions Against Self-interest

Evidence that defendants have acted against their economic interest can also constitute a plus factor. See, e.g., Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1243-45 (3d Cir. 1993) (denying defendants's motion for summary judgment where defendants refrained from bidding aggressively on accounts already serviced by other defendants). However, where there is an independent business justification for the defendants's behavior, no inference of conspiracy can be drawn. See Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1456-57 (11th Cir. 1991).

The only evidence of actions against interest that the class has identified is the producers's uniform participation in the Suspension Agreement.[7] The class argues that those producers with low dumping margins could have undercut other producers's prices and gained market share while still maintaining prices at profitable levels. Instead, the low tariff producers joined the Suspension Agreement. The class further

---

[7]The class also asserts that PCS acted against its self-interest when it agreed to supply potash to PCA when PCA's mine flooded. This agreement occurred in February 1987, before the class contends the conspiracy ever began. It is, therefore, of little relevance to this case.

posits that NMPC's[8] failure to object to the agreement was an action against self-interest.

In response, the producers point out that Department of Commerce investigations are unpredictable, and participation in the agreement reduced uncertainty. Furthermore, without the Suspension Agreement, even low tariff producers would have been required to post substantial bonds which would have caused considerable capital drain on corporate coffers. Like the Canadian producers, NMPC was uncertain about the ultimate outcome of the Department of Commerce's investigation. Under the Suspension Agreement, NMPC obtained certainty and a higher price for potash sold in the American market. This is the relief NMPC initially sought, and it is unsurprising that NMPC would not oppose such an outcome.

The class has thus failed to carry its burden to rebut the producers's independent business justification for their actions. See Laurel Sand & Gravel, Inc. v. CSX Transp. Inc., 924 F.2d 539, 543 (4th Cir. 1991). There is nothing in this record that contradicts the conclusion that ending the dumping investigation with a settlement that required unreasonably low potash prices to rise was a legitimate business decision for the low tariff producers. They benefitted from increased revenues, while avoiding the cost of litigation and the risk of penalties. This cannot be construed as an act against self-interest.

---

[8]The class also asserts that failure to object to the Suspension Agreement was contrary to Eddy's self-interest. This argument is puzzling because Eddy was not in existence at the time of the agreement and thus could hardly have objected to it.

### C.    Expert Testimony

Finally, the class argues that its expert's econometric model provided crucial confirmation that the prevailing potash prices during the alleged conspiracy were above those expected in the absence of collusion. While their expert concedes that the prices have primarily steadily decreased[9] since January 8, 1988, he asserts that prices would have been much lower absent an agreement to fix prices. We need not decide whether such evidence, in a proper case, could constitute a plus factor, because we find the report in this case is not probative of collusion.

The class's expert evidence is lacking in two crucial respects. First, the expert admits that his model fails to take into account the dramatic events of 1986. In his deposition, the class's expert confirmed that his model considers neither the privatization of PCS nor the anti-dumping proceedings. It is beyond dispute that even without collusion, those events would have led to higher potash prices. A model that

---

[9]It has been suggested that in the context of a price-fixing agreement among several producers in an oligopoly, the price actually would decrease somewhat over time because individual producers would attempt to "cheat" on the agreement by slightly lowering prices. Our review of the learned treatises on oligopolies and antitrust law does not seem to bear this theory out. First, there is very little discussion of the phenomenon of steadily *lowering* prices in an alleged price-fixing conspiracy. Second, several commentators have suggested that the incentive to lower prices while other oligopolists maintain prices deters collusion in the first place. See Jonathan B. Baker, Two Sherman Act Section 1 Dilemmas: Parallel Pricing, the Oligopoly Problem, and Contemporary Economic Theory, 38 Antitrust Bull. 143, 151 (1993) (analyzing George Stigler's 1964 article, A Theory of Oligopoly, 72 J. Pol. Econ. 44 (1964) and recognizing that "the unilateral incentive to deviate on a cooperative arrangement to fix price . . . is the very market force by which competition insures low prices and high output"); see also Donald F. Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. Law Rev. 655, 660 (1962) (noting that *without* an agreement among oligopolists, the pressure to cut prices is irresistible).

does no more than report that prices did, indeed, rise after these events tells us nothing about the existence of industry collusion.

A second flaw in the expert's report, as the magistrate judge noted, is that it relies almost exclusively on evidence (such as the producers's common membership in trade associations and their publication of price lists to customers) that is not probative of collusion as a matter of law. Under Federal Rule of Evidence 703, the facts underlying an expert's opinion need not be admissible if they are "of a type reasonably relied upon by experts in a particular field." The rule, however, contemplates that there will be "sufficient facts already in evidence or disclosed by the witness as a result of his or her investigation to take such expert opinion testimony out of the realm of guesswork and speculation." Hurst v. United States, 882 F.2d 306, 311 (8th Cir. 1989) (quotation omitted). In this case, the expert's model is fundamentally unreliable because of his heavy (if not exclusive) reliance on evidence that is not probative of conspiracy, coupled with his failure to consider significant external forces that served to raise the price of potash. See Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir. 1988).

## III. CONCLUSION

We have carefully considered each of the class's other arguments and find them to be without merit. The class has failed to present evidence of collusion sufficient to create a genuine issue of material fact. The producers are therefore entitled to summary judgment. For the foregoing reasons, the decision of the district court is affirmed.

JOHN R. GIBSON, Circuit Judge, dissenting, with whom HEANEY, McMILLIAN,

RICHARD S. ARNOLD, and MURPHY, Circuit Judges, join.

I dissent.[10]

The Court today rejects circumstantial evidence of conspiracy and requires direct evidence to withstand summary judgment in an antitrust case. The court's requirement of direct evidence is contrary to Monsanto v. Spray-Rite Service Corp., 465 U.S. 752, 768 (1984), which only required "direct or circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective." (Emphasis added). Because conspirators cannot be relied upon either to confess or to preserve signed agreements memorializing their conspiracies, the court's requirement for direct evidence will substantially eliminate antitrust conspiracy as a ground for recovery in our circuit.

The potash industry is an oligopoly in which the producers ended a price war and raised prices dramatically. The question is whether the class has shown that the new prices resulted from an agreement among the producers to raise and stabilize prices, rather than from independent reactions to market conditions combined with actions of the United States and Canadian governments. I believe that the class has satisfied the existing standards for circumstantial proof that the prices resulted from collusion.

The market for potash in the United States is dominated by Canadian firms. In 1986, 84.3 per cent of the potash consumed in the United States was imported from Canada. The principal Canadian potash producers are defendants in this case: Potash Corporation of Saskatchewan Incorporated (PCS); Potash Corporation of America

_____

[10]Four producers present special reasons entitling them to summary judgment. As to Noranda, New Mexico Potash Corporation, Eddy Potash and PPG, I concur in the judgment for the reasons discussed in the panel opinion at 176 F.3d 1055, 1071-72 (8th Cir. 1999).

(PCA); IMC Fertilizer Group, Inc.; Kalium; Noranda Minerals, Inc.; and Cominco. These Canadian firms are allied in Canpotex, a cartel that exists to sell potash outside the United States.

Potash is a mineral that is an essential ingredient in fertilizer. Because potash is an essential ingredient, the demand for potash is "inelastic," meaning that people will continue to buy it even if the price goes up, and they will not buy much more, even if the price goes down. The effect of this inelastic demand is that low prices are bad for the producers because the low price does not result in greater sales, except insofar as one producer can take sales away from other producers. Conversely, producers benefit from high prices, because they can sell about as much potash and keep the extra money. Newcomers cannot enter the market without first gaining control of a potash mine, which is a significant entry barrier preventing new sellers from entering the market.

The biggest of the Canadian producers, PCS, was originally owned by the province of Saskatchewan and was run as a governmental company for the avowed purposes of providing jobs and promoting the local Saskatchewan economy. Unfortunately for the potash industry, due to a slump in agriculture, potash demand fell tremendously in the 1980's, resulting in oversupply. The effect of the oversupply was a potash price war, with prices bottoming in 1986 when PCS charged C$45.36 per ton FOB mine. The industry was in crisis. PCS alone lost $103 million in 1986. The president of PCS Sales wrote in an internal memorandum that the industry would not be able to end the price war without "joint action":

> It is not possible for a single producer to affect [sic] a turn-around; however, joint action by a group of producers or governments could achieve this.

> Given the competitive nature of the business, joint action in North America is not possible except through a vehicle such as Canpotex.

-20-

Canpotex by itself cannot achieve the objectives unless there is tacit approval and support on the part of other potash exporters. The danger inherent in multilateral decisions by Canpotex (or PCS Sales) is that the world will again see us as a residual supplier. . . . PCS Sales' past support of price with a view to achieve stability is proof of the fallacy of such attempts.

In fact, Noranda, Kalium, PCA, and PCS had each tried to increase prices unilaterally during 1986 and were forced to rescind the increases when the other producers undercut them.

In 1986, the province of Saskatchewan elected a government which promised to privatize PCS. In preparation for privatizing the company, PCS replaced its management with Charles Childers, CEO, and William Doyle, sales chief, who came to PCS from rival company IMC. Childers was quoted in a trade publication as saying that it was incumbent on PCS "to lead" in order to "straighten out our own company and hopefully give some strength to the potash industry as a whole."

Also in 1986, two American producers filed a complaint with the United States Department of Commerce alleging that the Canadian companies were dumping potash in the United States at less than fair value (which can mean below prices charged for exports to a third country, below domestic prices in the country where the product is produced, or below a reconstructed cost of production, see David G. Haglund and Alex von Bredow, U.S. Trade Barriers and Canadian Minerals: Copper, Potash and Uranium 65). The Department investigated the claim and in August 1987 issued a preliminary determination that the Canadian producers were dumping potash. The Department ordered the Canadian companies to post bonds on all exports to the United States, which would be payable to the United States as a duty if there were a final determination of dumping and injury to American producers. The amount of the bond varied for each firm according to the firm's "dumping margin," that is, the average amount by which the firm's United States sale price fell below the foreign market value

in the cases examined by the Department. The dumping margins varied wildly, from 9.14 percent for IMC up to a crippling 85.2 percent for Noranda.

The Saskatchewan government responded to the United States action by adopting legislation which would give the province the power to limit and prorate production among Saskatchewan producers. See Haglund and von Bredow, supra, at 76. Within days of the introduction of the Saskatchewan legislation, on September 4, 1987, PCS announced that it would increase its prices by $35 per ton (from $58 to $93 per short ton for coarse grade FOB mine) to account for the bond expense. PCS's dumping margin was set at 51.9 per cent. PCS chose to raise its price only by $35, the amount necessary to pay duties on the industry average dumping margin of 36.62 per cent, rather than by the amount necessary to pay its own duty of 51.9 percent. It is undisputed that PCS chose the industry average figure in an attempt to pick a figure that other producers would follow. On September 11, 1987, the other Canadian producer defendants all[11] announced either a $35 price increase or a new price of $93, rather than simply increasing the price by the amount necessary to cover their individual duty costs.

On January 8, 1988, the Canadian producers reached an agreement with the Department of Commerce, suspending the earlier order. The suspension agreement imposed a minimum price on Canadian producers selling in the United States market, but oddly, the minimum price chosen was still less than the "foreign market value": the Canadians were only forbidden from undercutting "foreign market value" by more than fifteen percent of the producer's dumping margin. See Haglund and von Bredow, supra, at 88. The literal terms of the suspension agreement made each producer's minimum price vary with its own foreign market value (which was arrived at by different

---

[11]The PCA price list is dated September 16, 1987, but a September 11 memo to the file by vice president John Ripperger refers to the price increase as having already taken place.

methodologies for different firms) and with its own dumping margin; as the producers' expert William Barringer opined, the "uncertainties" in such a calculation make it impossible to predict with accuracy what price for any particular transaction would be in compliance with the agreement. However, correspondence from the Department of Commerce, which had responsibility for monitoring compliance with the suspension agreement, indicates that the Department used an industry average figure in assessing compliance.

As soon as the suspension agreement was in place, PCS again led the way in determining industry pricing, announcing it would rebate the earlier $35 surcharge, and on January 11, 1988, publishing its new price list at $86 per ton for granular grade, a net increase of $28 over the $58 it charged before the Department of Commerce imposed the bond requirement. The other Canadian producers matched PCS's increase within 11 days, and Kalium raised its price to $87. The Department of Commerce, in monitoring compliance with the agreement, noted that the agreement imposed an average floor price of $60.67, and that in the five months following the agreement the average price charged was $79.28.

The class's expert, Professor Gordon Rausser, opined and presented data purporting to show that the industry average prices for potash were higher than would be expected based on market factors during the 1988-1993 period (i.e., prices were "supra-competitive"). Perhaps more to the point, prices remained significantly higher than the minimum prices imposed by the suspension agreement from 1988 to 1992, with the exception of a short period in 1990 after PCS cut its prices drastically (and temporarily) for the avowed purpose of stabilizing prices within the industry.[12] Only

---

[12]The Court argues that Professor Rausser does not take into account the effect of the antidumping proceedings, and his testimony is thus irrelevant. Supra at 17. But Rausser's price level evidence specifically includes the prices that he contends would be required under the anti-dumping suspension agreement. Therefore, he clearly does

in January and February 1990, in the wake of this "market correction," did prices briefly dip below the suspension agreement price floor.

I.

This is a circumstantial evidence case based on parallel pricing, an example of the economic phenomenon called "conscious parallelism," in which competitors act alike. "[C]onscious parallelism is never meaningful by itself, but always assumes whatever significance it might have from additional facts." Donald F. Turner, The Definition of Agreement under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 658 (1962). The threshold question in deciding whether parallelism could be evidence of an agreement is whether the parallelism is "interdependent," meaning that the sellers would only take the course of action they took if they expected the others to behave the same way. Id. In this case interdependence is obvious; no producer would have been able to raise prices and keep them high unless the others did.

According to accepted economic theory, oligopolies are characterized by interdependent behavior because each seller is a big enough player to affect the market by price cuts; as a result, in raising or lowering prices or output, each seller must take into account his competitors' responses to his action. See Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and its Practice 37 (1994); Turner, supra, at 665. In an oligopoly, price rises are not sustainable as long as one major seller continues to undercut the price leader and steal his customers. When one seller raises his price, no buyers will buy his product unless the other sellers follow the price leader and raise their prices. The other oligopolists know that if they keep their prices low, the brave price leader will simply cut his prices and the battle will resume. On the other hand, if they raise their prices in turn, all sellers will receive higher prices and end

---

take into account the effect of the anti-dumping proceedings.

up with more money in their pockets.  See Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.).  The loser will be the consumer, who benefits from competition, not peaceful coexistence between suppliers.

Even though oligopoly pricing harms the consumer in the same way monopoly does, interdependent pricing that occurs with no actual agreement does not violate the Sherman Act, for the very good reason that we cannot order sellers to make their decisions without taking into account the reactions of their competitors.  See Turner, supra, at 665-68.  As then-Judge Breyer explained:

> Courts have noted that the Sherman Act prohibits agreements, and they have almost uniformly held, at least in the pricing area, that such individual pricing decisions (even when each firm rests its own decision upon its belief that competitors will do the same) do not constitute an unlawful agreement under section 1 of the Sherman Act.  That is not because such pricing is desirable (it is not), but because it is close to impossible to devise a judicially enforceable remedy for "interdependent" pricing.  How does one order a firm to set its prices without regard to the likely reactions of its competitors?

Clamp-All, 851 F.2d at 484 (emphases in original) (citations omitted).

Although interdependent pricing tends to happen naturally in an oligopoly, there are good reasons for competitors to enter into an actual agreement to fix prices.  First, successful price coordination requires accurate predictions about what other competitors will do; it is easier to predict what people mean to do if they tell you.  In the absence of express agreements, oligopolists

> must rely on uncertain and ambiguous signals to achieve concerted action. The signals are subject to misinterpretation and are a blunt and imprecise means of ensuring smooth cooperation, especially in the context of changing or unprecedented market circumstances.  This anticompetitive

minuet is most difficult to compose and to perform, even for a disciplined oligopoly.

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227-28 (1993). Second, competitors may have different preferences on decisions such as pricing and therefore may not be willing just to follow a leader's decision; words (or word substitutes) may be necessary to negotiate a common course of action. Third, some oligopoly markets are more conducive than others to supra-competitive pricing. Market traits that make oligopoly pricing more likely to succeed include a standardized product and publicly announced prices, which make it easier for sellers to keep track of each others' prices. See Hovenkamp, supra, at 171. Actual agreement allows competitors to modify their market to facilitate collusion, particularly by setting up procedures for detecting and punishing price-cutting.

While the oligopoly market structure naturally facilitates supra-competitive pricing, that same market structure also makes cooperative arrangements unstable, for this reason: It is in the best interest of each individual competitor for his competitors to charge high prices, while he charges somewhat less when that will help him steal customers from his competitors. See George J. Stigler, A Theory of Oligopoly, 72 J. Pol. Econ. 44, 46 (1964) ("Let us assume that the collusion has been effected, and a price structure agreed upon. It is a well-established proposition that if any member of the agreement can secretly violate it, he will gain larger profits than by conforming to it."). The temptation to shade prices secretly is just as inherent in the oligopoly market structure as the temptation to collude to raise prices. See Hovenkamp, supra, at 140-41; Jonathan B. Baker, Two Sherman Act Section 1 Dilemmas: Parallel Pricing, the Oligopoly Problem, and Contemporary Economic Theory, 38 Antitrust Bulletin 143, 154 (1993). Of course, if the competitors know about the undercutting, they will match it. See Stigler, supra, at 46. Therefore, price-shading and secrecy must go hand in hand. While publicly announced prices discourage the sellers from cutting prices because they know that their price cuts will be matched, thus eliminating any

competitive advantage, conversely, secretly negotiated discounts encourage price-cutting, since each seller hopes to steal customers without suffering retaliation from its competitors. See Hovenkamp, supra, at 141. As a result, a cartel can only succeed for any period of time if it has the ability to detect cheating and punish it effectively. See id.; Jacob Blinder & Sons, Inc. v. Gerber Prods. Co. (In re Babyfood Antitrust Litig.), 166 F.3d 112, 137 (3d Cir. 1999) (without a mechanism to detect conspirator cheating, no conspiracy could long endure); JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 190 F.3d 775, 777 (7th Cir. 1999) (oligopoly market where cheating can be detected is "ripe" for collusion).

If the oligopolists agree, either tacitly or expressly, to coordinate price increases, they have committed a per se violation of section 1 of the Sherman Act. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 212-18 (1940) (agreement to fix prices per se illegal); American Tobacco Co. v. United States, 328 U.S. 781, 809-10 (1946) (agreement need not be express as long as there is unity of purpose or "common design and understanding"). From the outside, however, the conspirators' actions may look the same as innocent oligopoly pricing. Although parallel pricing evidence is consistent with illegal conduct, it is equally consistent with lawful conduct, and thus does not tend to exclude the possibility of independent action, as required by Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984). Therefore, parallel pricing in a concentrated market cannot make a submissible section one case, although it may set the groundwork for such a case. See State of Arizona v. Standard Oil Co. (In re Coordinated Pretrial Proceedings), 906 F.2d 432, 444 (9th Cir. 1990) ("We recognize that such interdependent pricing may often produce economic consequences that are comparable to those of classic cartels. Nonetheless, proof of such pricing, standing alone, is generally considered insufficient to establish a violation of the Sherman Act.").

In a rather primitive way, the "plus factors" test incorporates the economic principles outlined above as a way to distinguish between innocent interdependence

and illegal conspiracy.  Under this test, plaintiffs can establish a prima facie case of conspiracy by showing parallel prices together with "plus factors" that increase the likelihood that the parallel prices resulted from conspiracy.  See, e.g., Wallace v. Bank of Bartlett, 55 F.3d 1166, 1168 (6th Cir. 1995); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1232-33 (3d Cir. 1993); Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1456 n.30 (11th Cir. 1991); Apex Oil Co. v. DiMauro, 822 F.2d 246, 253-54 (2d Cir. 1987).

We must, of course, take care to interpret the "plus factors" test in a way that is consistent with Monsanto.  With Monsanto in mind, it is useful to distinguish between "plus factors" that establish a background making conspiracy likely and "plus factors" that tend to exclude the possibility that the defendants acted without agreement.  For instance, "motive to conspire" and "high level of interfirm communications," are often cited as "plus factors" because they make conspiracy possible.  See, e.g., Apex Oil, 822 F.2d at 254.  Background facts showing a situation conducive to collusion do not tend to exclude the possibility of independent action, see id., but they nevertheless form an essential foundation for a circumstantial case.  In Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 593-98 (1986), the Supreme Court held that a conspiracy case based on circumstantial evidence must be economically plausible. The background "plus factors" of market structure, motivation and opportunity play an important role in establishing such plausibility.  Generally, these background "plus factors" are necessary but not sufficient to prove conspiracy.[13]

---

[13]It is possible that some types of evidence not logically inconsistent with innocence, such as a high level of interfirm communications, could become so unusual that they suffice to make a prima facie case.  See City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 570-73 (11th Cir. 1998) (incumbency rate on new contracts so high it was inconsistent with independent action), cert. denied, 120 S. Ct. 309 (1999).

On the other hand, acts that would be irrational or contrary to the defendant's economic interest if no conspiracy existed, but which would be rational if the alleged agreement existed, do tend to exclude the possibility of innocence. See Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 884 (8th Cir. 1978); Re/Max Internat'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1009-11 (6th Cir. 1999), petition for cert. filed, 68 U.S.L.W. 3138 (Aug. 17, 1999) (No. 99-294); City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 570-71 and n.35 (11th Cir. 1998), cert. denied, 120 S. Ct. 3309 (1999).

A.

Of the "plus factors" that merely make conspiracy possible, such as motive and opportunity to conspire, the class has adduced abundant evidence. Within this category some "plus factors" are purely situational, involving no action on the part of the defendant, and some are volitional; while the former are important, the latter begin to make the required showing of collusion.

The purely situational factors in this case are the market structure and the crisis in the potash industry. The structure of the potash market was conducive to collusion, featuring an oligopoly, barriers to new sellers entering the market, inelastic demand, and a standardized product. See JTC Petroleum, 190 F.3d at 777 (market with these features is ripe for collusion). However, there was excess production capacity, which spurs competition, and a price war, which shows the producers had not been able to achieve a stable interdependent equilibrium. Individual attempts in 1986 by Noranda, Kalium, PCA, and PCS to initiate a price rise had failed. The producers were losing millions of dollars. The producers had good reason to wish for a truce.

The volitional background "plus factors" are also very strong in this case. At least one of the defendants actively considered the possibility of joint action, as is stated in the PCS "Corporate Plan" document dated September 25, 1986: "It is not

possible for a single producer to affect [sic] a turn-around; however, joint action by a group of producers or governments could achieve this." Then there was a break in pattern, as the market went from price-war to profitability. See Turner, supra, at 672 ("Even in markets with few sellers, a fairly sudden change in pricing patterns is ground for suspicion.").

The class has introduced significant evidence of solicitations to enter a price-fixing agreement. Most, but not all, of the solicitations were by PCS. For instance, PCS freely complained to Kalium about Kalium's failure to adhere to pricing cut-offs. It was the custom in the industry to give lower prices at times of year when there was no immediate need for fertilizer, but to raise prices during high-use periods. Kalium published price lists announcing the pricing cut-off pattern, but in fact often shipped at the lower price after the cut-off date when it did not get orders filled before the cut-off date. PCS sales chief William Doyle repeatedly upbraided Kalium's vice president Robert Turner for shipping at the lower price after the cut-off date. Turner responded "something to the effect" that he would run his own business. Another time, Doyle called Turner and advised him that neither PCS, IMC, nor Cominco planned to accede to a certain customer's request to delay filling an order–that is, to ship at the old price after the cut-off. Turner answered that Kalium would try to ship by a certain date, as it had already said it would do in a letter to its customers. In the same vein, Doyle approached Turner about a certain bid and told Turner that Kalium's action was "wrong." John Ripperger, vice president of PCA, also testified that Doyle asked him if PCA was going to institute a price increase and not carry over product at the old price; Ripperger interpreted this question to mean that Doyle "would prefer that we don't make sales at the old price." Also, Doyle complained to Ripperger that PCA's pricing was undermining prices in Florida. Ripperger reported a conversation in which Gary Snyder of PCS asked a PCA salesman if he had sold at a certain price, and then said, "We [PCS] will take it [price] down and bury you [PCA] if that's what you want."

In 1988, after the sale of Kalium, Charles Childers, the CEO of PCS, called on Jay Proops, one of Kalium's new owners, armed with a chart showing that PCS was losing market share and that Kalium and other producers were gaining. Childers said Kalium was undercutting the price. Proops did some research and concluded that the chart had incorrect information and that Kalium was not undercutting. Therefore, Proops took no action in response to Childers's visit. In August 1990, Childers telephoned Joseph Sullivan, the other owner of Kalium. Childers told Sullivan that PCS's "price leadership was not working, despite major efforts" and that Childers "wanted to discuss this issue" with Sullivan. Sullivan declined to discuss prices.

Another time, a PCS employee took advantage of a trade meeting to apologize to Kalium's Turner about a low bid PCS had made by mistake. The PCS employee testified that he explained the mistake to Turner because he had "some concern that [the low price] may spread in the marketplace," and that he "was hopeful that it wouldn't go any darn further." Turner testified that Kalium matched the bid, but the reaction was "pretty much confined to that account. It did not go beyond that."

Though PCS made most of these overtures, on isolated occasions others did the same. Kalium's Turner called Ripperger of PCA to complain about a salesman who was cutting prices in Wisconsin. Similarly, Kip Williams of IMC complained to Ripperger about price-cutting in Florida.

Despite evidence that various defendants invited others to join in stabilizing prices, the class was not able to adduce direct evidence that the people on the receiving end of these solicitations accepted them and formed a deal. The evidence of solicitation is relevant, however, because it shows conspiratorial state of mind on the part of the solicitor and may also indicate that the solicitor was acting upon an earlier agreement. See 6 Phillip E. Areeda, Antitrust Law § 1419c (1986) ("Besides serving as direct evidence of a particular agreement, a solicitation might be circumstantial evidence of an ongoing conspiracy. Although no favorable response to the solicitation

is shown, the solicitation itself might be the product of a prior agreement.") (footnote omitted).

B.

The stage was clearly set for conspiracy in this case. The question is whether the additional evidence tends to exclude the possibility that the producers acted independently. I believe that it does.

First, the class has produced evidence that the producers cooperated in disclosing prices they had charged on particular sales. The industry practice was that each producer published a price list stating its price, the dates for which that price would be available, and any discounts that the producer would extend. The price lists were widely distributed to customers and certainly were no secret. However, actual prices sometimes deviated from the lists. When Childers and Doyle came to PCS, a key aspect of their program to raise industry prices was to insist on the list price. Doyle stated in an industry publication: "When I first came on board in the spring of 1987, the first word I put out to our sales force was that the price list was our price, stick to that price and no bending. Anybody who bends was out of here." Despite published price lists with the high follow-the-leader price, the producers continued to undercut each other in privately negotiated deals. (This is what one would expect even from a cartel operating under an illegal agreement, see Hovenkamp, supra, at 143.) When word of the discounting got around to PCS, PCS executives, particularly sales chief Doyle, were quite active in contacting the discounter and asking for verification of the rumored price. Significantly, Doyle testified that he never made any such price verification calls before 1987. The number of these verification communications is difficult to pin down, but Doyle estimated he initiated or received three to four calls per year with PCA, five to six per year with IMC, three to four per year with Cominco, five to six total with Kalium, "a few" with NMPC, and one to two total with Noranda. Doyle was by no means the only person making such calls on behalf of PCS, and there

-32-

is evidence that the other defendants called each other as well (except that there is no evidence of others calling Noranda).

These exchanges were often between high-level executives who were responsible for pricing decisions for their companies or who conveyed the price information to those who did set prices. For instance, Dale Massie, vice president of marketing for Cominco, testified that he had price verification communications with Doyle, head of sales at PCS. Massie testified that he made up the Cominco price lists, and the evidence shows that Doyle had a key role in determining PCS pricing policy. Charles Hoffman at IMC reported price information from Doyle to his superiors to inform them that "we would have to meet" PCS's price. Similarly, John Ripperger, vice president of PCA, had price verification discussions with Doyle, and Doyle said he had obtained price information from John Huber, Kalium's vice president of sales.

Price verification communications can either violate section 1 directly or they can be evidence of a violation. An agreement to exchange such communications can constitute an unreasonable restraint of trade under the rule of reason if the anticompetitive effect of the agreement outweighs its beneficial effects. See Penne v. Greater Minneapolis Area Board of Realtors, 604 F.2d 1143, 1148 (8th Cir. 1979); In re Coordinated Pretrial Proceedings, 906 F.2d at 447 n.13. In price fixing cases, the exchange of sensitive price information can sometimes be circumstantial evidence of the existence of a per se violation. See Penne, 604 F.2d at 1149; In re Coordinated Pretrial Proceedings, 906 F.2d at 447 n.13; In re Plywood Antitrust Litigation, 655 F.2d 627, 633-34 (5th Cir. Unit A 1981); Morton Salt Co v. United States, 235 F.2d 573, 577 (10th Cir. 1956) (competitors' exchange of price information "is a factor appropriately considered in determining the existence of a conspiracy"). It is this second theory that the class pursues in this case.

Again, acts that would be contrary to the actor's self-interest in the absence of a conspiracy, but which make economic sense as part of a conspiracy, provide the

crucial type of "plus factor" evidence necessary to exclude the possibility of independent action. The class contends that "the price verification calls were inconsistent with the 'pricing secrecy' sought by participants in oligopolistic industries because in such industries 'each producer would like to secretly "shade" price[s], thereby gaining sales and avoiding retaliation.'" The class's argument finds support in the reasoning of United States v. United States Gypsum Co., 438 U.S. 422 (1978), which stated:

> Price concessions by oligopolists generally yield competitive advantages only if secrecy can be maintained; when the terms of the concession are made publicly known, other competitors are likely to follow and any advantage to the initiator is lost in the process. Thus, if one seller offers a price concession for the purpose of winning over one of his competitor's customers, it is unlikely that the same seller will freely inform its competitor of the details of the concession so that it can be promptly matched and diffused.

Id. at 456 (citations omitted). Therefore, if there were no reciprocal agreement to share prices (and the producers certainly do not argue that there was), an individual seller who revealed to his competitors the amount of his privately negotiated discounts would have been shooting himself in the foot. On the other hand, if there were a cartel, it would be crucial for the cartel members to cooperate in telling each other about actual prices charged in order to prevent the sort of widespread discounting that would eventually sink the cartel.

Nor is there any legitimate business purpose which would make it desirable for the producers to reveal their pricing concessions notwithstanding the disadvantage of helping their competitors compete more effectively. These private communications between competitors had no redeeming effect of informing customers of prices, such as the advance announcements of price increases in Reserve Supply Corp. v. Owens-Corning Fiberglas Corp., 971 F.2d 37, 54 (7th Cir. 1992), or the advertisement of fees in Wallace v. Bank of Bartlett, 55 F.3d 1166, 1169 and n.5 (6th Cir.1995). Cf. Market

Force, Inc. v. Wauwatosa Realty Co., 906 F.2d 1167, 1173 (7th Cir. 1990) (defendant broker announced intent to pay reduced commission to buyer's brokers; legitimate business reason was that other brokers needed to know in advance what commissions defendant was willing to pay). See also United States v. Citizens & S. Nat'l Bank, 422 U.S. 86, 113-14 (1975) (correspondent bank program legitimate reason for "intimate and continuous cooperation and consultation on interest rates"). To the contrary, the prices stated here were discounts from the published price lists that reflected the prices the producers wanted to charge. The producers had no interest in publicizing these discounts to the market as a whole. Nor is there any evidence of special necessity for horizontal price communications, such as the customer fraud which justified the producers' practices in Cement Manufacturers Protective Ass'n v. United States, 268 U.S. 588, 595-96 (1925). The price communications in this case are more like those in In re Coordinated Pretrial Proceedings, 906 F.2d at 448, which served "little purpose" other than facilitating price coordination.

The Court today concludes that voluntarily revealing secret price-cutting to one's competitors is not probative of conspiracy, for three reasons, each of which is unsound. First, the price verification communications involved completed sales, not future sales. The Court states: "Common sense dictates that a conspiracy to fix a price would involve one company communicating with another company before the price quotation to the customer." Supra at 10. This misconceives the purpose for which the price communications are being offered. The communications are not supposed to be direct evidence of a one-time mini-conspiracy to fix the price on one sale. Rather, they are circumstantial evidence of a type of behavior one would not expect in the absence of an agreement to cooperate. If no cartel was in place, each competitor would seek to benefit from high prices generally, while secretly shading prices when it would gain a customer without provoking retaliation. Confessing price-cutting when one needn't do so would only invite retaliation and guarantee that one's competitors could match the discounted price exactly next time. This is contrary to self-interest. On the other hand, if the producers were cooperating in a cartel, a necessary feature of their arrangement would be some way to determine who was discounting. Thus, confessing price-cutting

to competitors makes no economic sense for independent actors, but makes perfect economic sense for cartel members. The Court has rejected circumstantial evidence of an agreement because it is not direct evidence.

The Court's second reason for dismissing the price verification evidence is that "[t]here is no evidence to support the inference that the verifications had an impact on price increases." Supra at 9. The class points to the price verifications as circumstantial evidence of a broader conspiracy. Parallel price increases are the starting point for the class's case, so that if the conspiracy is proved, effect on prices has been proved at the first step. Compare Court opinion, supra, at 10 ("Parallel pricing has been conceded") with In re Baby Food, 166 F.3d at 128-32 (parallel pricing not established). The Court argues that prices eventually went down, supra at 17, but this glosses over the fact that they first rose dramatically, then remained above both the forecasted price based on market factors and the suspension agreement price until 1992 (with the exception of the two-month dip caused by the PCS "market correction program"). If, to prove collusion, a plaintiff has to prove that there was no cheating, thus no downward pressure on prices, cartels will be quite safe from the Sherman Act. See generally Hovenkamp, supra, at 143, § 4.1a "The (Virtual) Universality of Cartel Cheating"; cf. United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 89-90 (2d Cir. 1999) (in criminal price-fixing case involving widespread cheating by cartel members, conspiracy can "[affect] prices even when it falls short of achieving the conspirators' target price").

To support its proposition that there is nothing suspicious about oligopolists exchanging non-public price information, the Court relies on In re Baby Food Antitrust Litigation, where the Third Circuit stated: "No evidence . . . shows that any executive of any defendant exchanged price or market information with any other executive." 166 F.3d at 135. The court held that price discussions among low level employees did not show a conspiracy. Id. at 137. This reasoning implies that if high-level executives had been involved, it would have constituted evidence of conspiracy (if, indeed, the plaintiffs had been able to prove parallel pricing, which they did not in In re Baby Food,

id. at 128-32). In our case there is a wealth of evidence that high level executives, who were in a position to respond to what they learned, were directly involved in exchanging secret price information. Citing In re Baby Food in a case with this kind of evidence vitiates the distinction on which the Third Circuit relied.

The Court ignores the Third Circuit's articulated rationale in In re Baby Food because the Court thinks the rationale is belied by facts in that case showing that high level executives used information gathered by low-level employees. Supra at 11. The Third Circuit apparently saw a crucial difference between gathering information to use to one's own advantage and giving out information for one's competitors to use to their advantage (and one's own detriment). However gladly the baby food executives used information relayed to them, the facts of In re Baby Food recited by the Third Circuit do not show that the executives were giving away their firms' secrets. The Third Circuit expressly stated that Anderson, a salesman who testified that he gathered information for his superiors, was not instructed to go around giving out advance pricing information about his own company. 166 F.3d at 126 ("Runk [Anderson's superior] never directed him to disseminate Heinz price information to competitors in the field"). In this case, it is the potash producers' pattern of giving their competitors valuable information that we identify as an act contrary to the producers' self-interest unless there was an agreement. Cf. 7 Up Bottling Co v. Varni Bros. (In re Citric Acid Litigation), 191 F.3d 1090, 1100 1110 (9th Cir. 1999) (existence of competitor's price list in defendant's files not probative because there is no evidence the competitor gave it to the defendant; defendant's disclosure of secret sales information to trade association was not an act contrary to self-interest because defendant was assured of confidentiality), petition for cert. filed, -- U.S.L.W. -- (U.S. Jan. 19, 2000) (No. 99-1218).

The Court's third reason for dismissing the price verifications is that the verifications were "sporadic." Supra at 10. The evidence indicates that the producers called each other when they had reason to think their competitors were cutting prices, and that they responded to each other's inquiries. The total number of such inquiries

is difficult to set, but the defendants characterize it as "no more than several dozen"-- surely more than a scintilla. Cf. Container Corp., 393 U.S. at 335 (liability where "all that was present was a request by each defendant of its competitor[s] for information as to the most recent price charged or quoted, whenever it needed such information" . . .; "[t]here was to be sure an infrequency and irregularity of price exchanges").

This "sporadic" argument seems to be directed to the quantum of proof, rather than the quality of it. In other words, it is an argument that more proof should exist, rather than an argument that the existing proof is not probative. If the plaintiff adduces evidence of the kind that tends to prove the existence of a conspiracy, I do not believe that Monsanto and Matsushita give a justification for rejecting it. Monsanto and Matsushita lay out a test for the kind of proof necessary in antitrust cases, not the quantity of it. Compare Monsanto, 465 U.S. at 764; and Matsushita, 475 U.S. at 587-88 ("antitrust law limits the range of permissible inferences from ambiguous evidence"; if claim makes no economic sense, plaintiff's evidence must be "more persuasive" than would otherwise be necessary) with Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-55 (1986) (where substantive law imposes a heightened standard of proof, as in libel cases, a higher quantum of proof is required to survive summary judgment). Cf. Merck-Medco Managed Care v. Rite Aid Corp., No. 98-2847, 1999 WL 691840, at *8 (4th Cir. Sept. 7, 1999) (unpublished per curiam) (holding that Monsanto-Matsushita inquiry requires higher quantum of probative evidence depending on relative strength of plaintiff and defendant's cases). There is no heightened "clear and convincing" standard of proof in civil antitrust conspiracy cases, requiring a greater quantum of proof than the ordinary "preponderance of the evidence" standard. See In re Brand Name Prescription Drugs Antitrust Litig., 186 F.3d 781, 787-88 (7th Cir. 1999), petition for certiorari filed, 68 U.S.L.W. 3327 (U.S. Nov. 5, 1999) (No 99-786). The plaintiff's evidence must amount to more than a scintilla, but the plaintiff does not have to outweigh the defendant's evidence item by item. See Rossi v. Standard Roofing, Inc., 156 F.3d 452, 466 (3d Cir. 1998).

The Ninth Circuit, in its recent decision of In re Citric Acid Litigation, dismissed evidence of price discussions as "sporadic," but it is not clear whether the court rejected the evidence qualitatively under Monsanto or because it was not quantitatively sufficient to create a material issue of fact. In Citric Acid the existence of a price-fixing conspiracy was conceded, but the question remained whether one defendant, Cargill, had been a party to the conspiracy. See 191 F.3d at 1093. Cargill received summary judgment despite testimony that a competitor had discussions regarding the bidding price of citric acid with someone from Cargill. The Ninth Circuit cited In re Baby Foods and dismissed the evidence as "sporadic price discussions with one individual at Cargill." Id. at 1105. The testimony in question was vague, with no specific evidence of what was said, and there were other qualitative reasons for rejecting it, including the fact that the timing of the alleged discussions was inconsistent with the plaintiff's theory of the case. See id. at 1104-05. The court also concluded the case by saying that there was no more than a scintilla of evidence that Cargill participated in the conspiracy. See id. at 1106. In re Citric Acid is therefore consistent with the ordinary summary judgment standard in cases requiring a preponderance of evidence, and it does not stand for the proposition that a heightened quantum of proof is necessary to survive summary judgment in antitrust cases.

The Court states in this case that the fact that there were "several dozen communications" among competitors is not "significant." Supra at 10. I would hold that evidence of several dozen communications of the type that tends to prove conspiracy creates a genuine issue of material fact.

In addition to the price verification practices, evidence concerning PCS's "market correction program" in December 1989 also tends to exclude the hypothesis of independent action. On December 18, 1989, PCS cut its prices by $18 a ton for five days. PCS's Carlos Smith stated that the purpose (and effect) of the program was to stabilize prices in the industry:

> Q. [W]as it an attempt to stabilize prices?

A.  Yes.

. . .

Q.  And did it work?

A.  It leveled them.

A high-level Kalium executive, John Huber, wrote the following notes: "Program was a market correction.  Weren't trying to teach other people--only got tired of people who kept chipping away.  Program was reasonable one--checked with people. . . .  People started <u>cheating</u> . . . .  <u>We</u> wanted to get their attention.  Program to be short, very specific." (Emphasis added.)  Huber said he did not recall to whom he had been talking when he made these notes, but the use of the phrase, "We wanted to get their attention," suggests he was taking dictation from someone at PCS.[14]

The wording of Huber's notes implies that the "market correction" program was a way of disciplining producers who had breached an earlier agreement. In plain English, the use of the word "cheating" denotes the breach of an agreement or convention, not independent action. Without an agreement, price cutting would be called "competing," not "cheating."

Moreover, the Huber notes suggest PCS's action was not lonely price leadership, but rather that PCS "checked with people" before cutting prices.  Apparently, PCS did not want to risk sparking another price war by letting other producers misunderstand the intent behind the "market correction program."  These notes illustrate a situation in which smoke signals were just too ambiguous and dangerous to be trusted, so that

---

[14]Another memorandum in the same time frame prepared by a Noranda employee states: "Casual conversation at the SMA meeting with a fairly senior PCS guy got quite pointed about 'market correction plan' and he was happy to indicate that they could do it again . . . .  I don't think the conversation was idle."  The similarity of the messages lends additional weight to the inference that PCS was the source of information for the Kalium memo.

competitors had to resort to explicit communications to coordinate prices. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227-28 (1993) ("anticompetitive minuet" difficult to compose and perform). The notes, taken together with the successful "market correction" program, tend to exclude the possibility of independent action. Cf. Petruzzi's IGA, 998 F.2d at 1233 (predatory pricing that looks like cartel disciplining cheaters is circumstantial evidence of conspiracy).

The class also points to another piece of evidence that tends to exclude the hypothesis of independent action. This is the Canpotex memorandum of Friday, January 8, 1988, which stated:

> FYI Canadian potash producers have reached agreement with the United States Department of Commerce and all dumping action has been suspended for a minimum of 5 years. It is rumored that the USD per metric ton increase posted by Canadian producers in 1987 to cover possible tariff payments to the U.S. Govt will be refunded in full or part. In the meantime new price lists are being issued on Monday Jan. 11 at: Standard Grade USD 80.00; Coarse Grade USD 84.00; Granular Grade USD 86.00.

(emphasis added). Canpotex is the Canadian producers' cartel organized for sales outside the United States.

Again, the Court misconceives the import of this evidence, rejecting it as direct evidence of an attempt to reach an agreement, when the class offers it as circumstantial evidence of an agreement that already existed. The Court considers it crucial to establish who received the Canpotex memorandum, supra, at 13-14, apparently reasoning that if the memorandum was meant to negotiate an agreement, only people who got the memorandum could respond to it. Instead, the class offers this memorandum as circumstantial evidence tending to show that Canpotex knew on Friday, January 8, of an existing agreement to raise prices. The prophecy by Canpotex that its members would issue new "price lists" with particular prices does indeed tend

-41-

to show the price increase was coordinated, because otherwise it would have been impossible to know in advance what the individual producers would do.

In sum, the class has adduced evidence of a market structure ripe for collusion, a sudden change from price war to supra-competitive pricing, price-fixing overtures from one competitor to another, voluntary disclosure of secret price concessions, an explicitly discussed cheater punishment program, and advance knowledge of other producers' price moves.  Taken together, this list of "plus factors" adds up to evidence that satisfies the Monsanto standard.

II.

As I understand our previous cases, it is still necessary to take into account the producers' explanation of their conduct in order to ascertain whether their theory deprives the plaintiffs' case of its probative value.  See Corner Pocket of Sioux Falls, Inc. v. Video Lottery Tech., Inc., 123 F.3d 1107, 1112 (8th Cir. 1997), cert. denied, 522 U.S. 1117 (1998) ; Lovett v. General Motors Corp., 998 F.2d  575,  580-81 (8th Cir. 1993).  In this case, the producers' theory is that the price rises are explained entirely by the suspension agreement and the spectre of Saskatchewan prorationing legislation.  In light of the evidence adduced by Professor Rausser and the Commerce Department correspondence indicating that the industry price far exceeded the price floors set by the suspension agreement, I cannot see that the producers' explanation deflates the class's price-fixing theory.  I fully understand that the producers dispute Rausser's understanding of the suspension agreement price levels.  Moreover, there is absolutely no dispute that prices had to rise above the price-war levels to comply with the suspension agreement.  However, the producers make no attempt to identify a price floor required by the suspension agreement or to show that the producers actually set their prices, for instance the January 11 price of $86.00 for granular grade, by reference to the suspension agreement floor.  Indeed, their expert William Barringer argued that it was actually impossible to ascertain whether a given price would satisfy the

agreement. Instead, the producers' expert Andrew Rosenfield opined that the defendants needed only to set their prices "well above" suspension agreement floor prices. Under these experts' testimony, the suspension agreement did not dictate the actual prices charged; therefore, the existence of the suspension agreement does not explain away the facts supporting the class's theory that the actual prices were set by illegal collusion.

Not only were the January 1988 prices higher than the prices required by the suspension agreement, but there is evidence tending to prove that the producers felt free to dip below the suspension agreement prices when it served their purposes. Professor Rausser's price chart shows that during PCS's "market correction" program in January and February 1990, prices dipped below the suspension agreement floor. Deliberately taking prices below the suspension agreement floor to punish price-cutters is not a convincing sign of industry devotion to the suspension agreement, and the fact that it happened discredits the producers' argument that their prices were compelled by the suspension agreement.

The producers have not made a showing that the governmental intervention so explains their actual behavior as to take away the probative power of the class's case. This case should therefore proceed to trial. Accordingly, I dissent.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.