Brian **WANDERSEE and Advanced Cleaning Technologies, Inc.,** Respondents,

v.

**BP PRODUCTS NORTH AMERICA, INC.,** Appellant.

No. SC 88832.

Supreme Court of Missouri, En Banc.

July 29, 2008.

Rehearing Denied Sept. 30, 2008.

---

Dawn M. Johnson, Jordan B. Cherrick, David P Niemeier, Robert L. Duckels, Greenfelder, Hamker & Gale, P.C., St. Louis, MO, for Appellant.

Joseph R. Dulle, Jeremy A. Salvatori, Stone, Leyton & Gershman, P.C., St. Louis, MO, for Respondents.

Donald L. O'Keefe, St. Louis, MO, for Defendant.

MICHAEL A. WOLFF, Judge.

### Introduction

Brian Wandersee is the owner and president of Advanced Cleaning Technologies, Inc. (ACT). BP Products North America, Inc. (BP) accused Wandersee and another ACT employee of stealing a car wash system belonging to BP, which led to criminal charges against Wandersee and the other ACT employee. After those charges were dropped, Wandersee and ACT sued BP for injurious falsehood. The jury found BP liable to Wandersee and ACT and awarded damages of $605,350. Following the verdict, BP filed a motion for judgment as a matter of law or, in the alternative, a new trial. The trial court overruled BP's motions. On appeal, BP raises the following contentions:

(1) BP is entitled to judgment as a matter of law because the knowledge of BP's agent as to the falsity of the theft report cannot be imputed to BP, the corporation, and, therefore, the evidence was insufficient for the jury to find that BP acted knowingly or recklessly in making the theft allegation.

(2) BP is entitled to judgment as a matter of law because the evidence was insufficient to show that the false report caused injury because of independent intervening causes such as the police investigation and the prosecutor's decision to indict.

(3) BP is entitled to a new trial because the jury instruction describing the burden of proof for injurious falsehood was incorrect.

(4) BP is entitled to a new trial because the trial court failed to instruct the jury that BP had a qualified privilege where it acted honestly and in good faith.

(5) BP is entitled to a new trial because the trial court should not have permitted the jury to award damages for lost profits, foregone wages, and attorneys' fees and should not have allowed damages occurring after 2000.

(6) The trial court should have granted a remittitur because the jury's award of damages exceeded the amount that would be fair and reasonable compensation for the injuries to ACT and Wandersee.

### Facts

Advanced Cleaning Technologies, Inc. (ACT) distributes, installs and services car wash systems. ACT is the exclusive distributor for PDQ Manufacturing, Inc., the world's largest manufacturer of the "touch-free in-bay" automatic car wash systems.

BP Products North America Inc., formerly known as Amoco Oil Company, is a refiner and distributor of petroleum prod-

ucts that owned gasoline stations in the St. Louis area until late 1999, when BP sold its stations.

In December 1997, BP ordered three car wash systems from PDQ Manufacturing. BP informed PDQ that it planned to install these car wash systems in three of its new St. Louis area stations. Because construction of the three stations was not yet complete at the time of the order, BP requested that delivery be delayed. PDQ called Wandersee and asked whether ACT, its exclusive distributor, could take delivery of and store the car wash systems until BP needed them. Wandersee agreed, with the understanding that the car wash systems would remain in ACT's warehouse until BP called and requested installation. Pursuant to this agreement, PDQ shipped the car wash systems to ACT's warehouse. BP paid $437,697.92 for the three car wash systems, including a payment of $99,916.67 for a car wash system BP planned to install in its O'Fallon station.

BP called ACT in 1998 and arranged for the delivery and installation of two of the three PDQ car washes. The third car wash, which BP had ordered for installation at the O'Fallon station, remained in storage at the ACT warehouse.

During a meeting in February 1999, Wandersee informed Mary Fissenhasion, BP's company account executive and St. Louis market manager, that ACT still had the O'Fallon station car wash in storage because BP had not yet requested its installation. Fissenhasion told Wandersee that the O'Fallon station car wash was "not in her budget" and that she did not know whom Wandersee should contact about it.

BP's regional security advisor, Ron Benhart, received a telephone call in July 1999 from ACT employee Tami Weeks. Weeks told Benhart that she believed Wandersee and Steve Amick, a former employee of BP

who had begun working for ACT, were attempting to sell the O'Fallon car wash without BP's knowledge. According to Weeks, Wandersee and Amick claimed to have "commandeered" the O'Fallon car wash from BP. Weeks alleged that Wandersee had unauthorized possession of the O'Fallon car wash. She told Benhart that she had heard Wandersee refer to the O'Fallon station car wash as a "freebie" and that he had bragged that ACT could sell it at a "100 percent" profit. In support of her allegations, Weeks gave Benhart the serial number of the O'Fallon car wash, which she stated confirmed BP's ownership of the machine. Weeks also gave Benhart a document that she claimed was a falsified purchase order that Amick had created to facilitate the theft.

After speaking with Weeks, Benhart contacted PDQ to verify the serial number. PDQ verified that the serial number matched that of the O'Fallon car wash and provided Benhart with BP's purchase order for the machine, an order verification form, a delivery verification form, and proof of full payment by BP. Benhart also checked with BP's records and spoke to BP's regional vice president about the allegation. The regional vice president told Benhart that the O'Fallon station had never been built and that there was, in his opinion, no reason why ACT should still have the car wash.

Benhart contacted the Overland, Missouri, police department on July 26, 1999 to report Weeks' allegation. Benhart gave the police documents demonstrating BP's purchase and payment for the O'Fallon car wash system. Later that day, Weeks and Keith Payette, a part owner and former employee of ACT, went to the Overland police department and gave written statements supporting Weeks' prior allegation of theft.

Later that day, the Overland police department applied for and received a warrant to search ACT's warehouse. During their search, the police discovered and seized the O'Fallon car wash. The police arrested Wandersee the next day.

Wandersee and Amick were indicted in May 2000 on charges of stealing in connection with the alleged theft of the O'Fallon station car wash. After taking depositions, however, the prosecutor filed a *nolle prosequi* abandoning the prosecution.

ACT and Wandersee filed the present suit against BP and PDQ in April 2003. They alleged that, as a result of BP's false theft accusation, Wandersee and ACT sustained damages that included legal costs, loan costs and a loss of profits. The jury awarded ACT and Wandersee $605,350 in damages. The trial court entered judgment in accordance with the verdict, overruling motions for judgment notwithstanding the verdict and, in the alternative, for new trial. Following an opinion by the court of appeals, this Court granted transfer. Mo. Const. art. V, § 10.

## Analysis

### (1) BP's Knowledge

■ Was the evidence at trial sufficient to support a finding that BP acted either knowingly or recklessly in making the allegation of theft against Wandersee and ACT?

■ In a claim for injurious falsehood, "one who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he *knows* that the statement is false or *acts in reckless disregard* of its truth or falsity." *State ex rel. BP Products North America Inc. v. Ross*, 163 S.W.3d 922, 928 (Mo. banc 2005) (quoting Restatement (Second) of Torts § 623A (1977)) (emphasis added).[1]

BP argues that the trial court erred in overruling its motion for judgment notwithstanding the verdict because Wandersee and ACT failed to present evidence that Ron Benhart acted knowingly or recklessly in making the false allegation of theft. Under the facts of this case, however, the relevant knowledge is that of BP, not Benhart.

Wandersee and ACT sued BP for injurious falsehood. The instructions submitted to the jury required that the jurors determine whether *BP itself*, rather than Benhart, engaged in the conduct necessary to sustain plaintiff's claim of injurious falsehood.[2] BP did not object to the jury in-

---

1. In *State ex rel. BP Products North America Inc. v. Ross*, 163 S.W.3d 922 (Mo. banc 2005), a writ proceeding arising out of the instant case, this Court held that the five-year statute of limitations applies to injurious falsehood claims. *Id.* at 927.

2. The trial court submitted the following injurious falsehood instruction to the jury: "Your verdict must be for plaintiffs ... and against defendants, if you believe:

First, defendant BP made one or more of the following statements to the Overland Police Department:

a. that plaintiff ACT had unauthorized possession of defendant BP's car wash, or
b. that Steve Amick, while an employee of BP, falsified a purchase order for a car wash and had it delivered to [ACT], and

Second, one or more of the statements were false when made to the Overland Police Department, and

Third, at the time the statement was made, defendant BP either knew that the statement was false or acted in reckless disregard of the truth or falsity of the statement, and

struction on the grounds that it failed to distinguish between Benhart and BP's knowledge. Thus, as BP explained in its motion for directed verdict, a successful claim for injurious falsehood in this case required plaintiffs "to prove that *BP knew* its statement to the police department was false or it acted in reckless disregard of the truth or falsity of its alleged statement." (emphasis added).

■ As a corporation, BP can obtain knowledge only through its agents and, under the well-established rules of agency, the knowledge of agents obtained in the course of their employment is imputed to the corporation. *Packard Mfg. Co. v. Indiana Lumbermens Mut. Ins. Co.*, 356 Mo. 687, 203 S.W.2d 415, 421 (1947); AM. JUR.2D *Corporations* § 1442.

A review of the record reveals that at the time Ron Benhart—acting within the course and scope of his employment with BP—accused Wandersee of theft, various BP employees had actual knowledge that BP had authorized Wandersee's possession of the O'Fallon car wash. In December 1997, BP's authorized agents ordered and authorized the delivery of the O'Fallon car wash to ACT's warehouse with the understanding that ACT would deliver the car wash when BP needed it. Wandersee informed BP's St. Louis market manager, Mary Fissenhasion, in February 1999 that ACT still had the O'Fallon car wash in its warehouse. Fissenhasion told Wandersee that she did not know whom to contact regarding the car wash's delivery.

Each of these interactions indicates actual knowledge on the part of the BP agent involved that ACT was authorized to have possession of the O'Fallon car wash. Under the rule set forth in *Packard Mfg.*

*Co.*, the agents' knowledge of ACT's authorized possession is imputed to the corporation. In other words, it is accurate to say that, because its agents had actual knowledge that ACT and Wandersee had authorized possession of the O'Fallon car wash, *BP itself* knew that ACT and Wandersee had authorized possession of the O'Fallon car wash.

■ BP urges this Court to reverse the trial court's judgment on public policy grounds. A holding that a corporation is liable for the knowledge possessed by its agents is equivalent, according to BP, to a holding that "every agent must possess the knowledge of every other corporate agent." With this rationale, BP mischaracterizes the issue in this case. By holding BP accountable for the knowledge of its agents, this Court does not require that every agent of a corporation possess the knowledge of every other agent as BP claims. Our holding merely requires that a corporation accept responsibility for the knowledge of its agents. It is a "well-established rule of agency that the knowledge of an agent of a corporation with reference to a matter within its scope of his authority and employment and to which his authority or employment extends is imputed to the corporation." *Packard Mfg.* at 421. As such, the knowledge of BP's agents must be imputed to the corporation as a whole. By asking this Court not to impute responsibility to corporations for the information stored in its records and possessed by its various agents, BP asks this Court to encourage irresponsibility. Such a holding would give corporations an incentive to delegate responsibility to its least informed agents in order to avoid liability. As the United States Supreme Court explained in *New*

Fourth, Defendant BP should have recognized that the statement was likely to cause economic damage to plaintiffs, and

Fifth, as a direct result of one or more of the statements, plaintiffs Brian Wandersee and ACT, suffered economic damages."

*York Cent. & H.R.R. Co. v. U.S.*, 212 U.S. 481, 492–493[1], 29 S.Ct. 304, 53 L.Ed. 613 (1909), "Since a corporation acts by its officers and agents, their purposes, motives, and intent are just as much those of the corporation as are the things done. If, for example, the invisible, intangible essence or air which we term a corporation can level mountains, fill up valleys, lay down iron tracks, and run railroad cars on them, it can intend to do it, and can act therein as well viciously as virtuously." *Id.* (citing Bishop's New Criminal Law, § 417).

Wandersee and ACT presented sufficient evidence for a jury to find that at the time BP, acting through agent Ron Benhart, made the false theft allegation, BP, because of its agents' knowledge that ACT's possession of the car wash was authorized, knew that the theft allegation was false. As such, ACT and Wandersee produced sufficient evidence to support a jury finding that BP had actual knowledge of the theft allegation's falsity. The trial court did not err in overruling BP's motion for judgment notwithstanding the verdict on this ground.

### (2) Causation

■ Did Wandersee and ACT produce sufficient evidence to show that BP's false statement caused the injuries claimed?

A series of events led up to the prosecutor's decision to seek an indictment. These events, according to BP, constituted independent intervening causes that severed the causal link between BP's initial report of theft and the prosecutor's decision to indict Wandersee.

■ To prove the element of causation in a claim for injurious falsehood, a plaintiff must show that the defendant's false statement caused plaintiff's pecuniary loss.[3] *State ex rel. BP Products North America Inc. v. Ross*, 163 S.W.3d 922, 928 (Mo. banc 2005) (citing *Annbar Assocs. v. Am. Express Co.*, 565 S.W.2d 701, 706 (Mo.App.1978) (quoting Restatement (Second) of Torts § 623A (1977))). A jury can find that publication of an injurious falsehood is the legal cause of a pecuniary loss if: (1) it is a substantial factor in bringing about the loss and (2) there is no rule of law relieving the publisher from liability because of the manner in which the publication has resulted in the loss. Rest.2d of Torts at § 632. The liability of a defendant for injurious falsehood "is restricted to ... the pecuniary loss that results directly and immediately from the effect of the conduct of third persons ... caused by disparagement." *Id.* at 633.

■ In evaluating the liability of the defendant for economic harm resulting from the actions of a third party, "it is not necessary that the [third party's] conduct should be determined exclusively or even predominantly by the publication of the [false] statement. It is enough that the disparagement is a factor in determining his decision, even though he is influenced by other factors without which he would not decide to act as he does." *Id.* at § 632, cmt. c. An intervening event will not sever the causal chain if the intervening cause is a "foreseeable and natural product" of the original act. *Tompkins v. Cervantes*, 917 S.W.2d 186, 191 (Mo.App.1996).

BP argues that several events severed the causal link between Benhart's false

---

**3.** Under a claim for injurious falsehood, a plaintiff may only recover for pecuniary, or economic, damage resulting from the defendant's false statement. *State ex rel. BP Products North America Inc. v. Ross*, 163 S.W.3d 922, 928 (Mo. banc 2005) (citing *Annbar* at 708 (quoting Rest.2d of Torts at § 623A)). As such, the plaintiff must establish "[p]roof of pecuniary loss" as "an element of a claim for damages for injurious falsehood." *Id.*

statements and the plaintiffs' ultimate harm. The intervening causes were: (1) the witness statements given by various employees of ACT, which corroborated Benhart's allegations of theft; (2) a judge's decision to authorize a search warrant; (3) the Overland police department's subsequent criminal investigation; and (4) the prosecutor's decision to seek an indictment based on the police department's investigation.

BP focuses on the fact that, as the theft complaint moved through the criminal justice system, the various intervening actors did not base their decisions solely, if at all, upon Benhart's original accusation of theft. BP asserts that, because not all of the actors who contributed to Wandersee's ultimate indictment were motivated by Benhart's initial accusation, Benhart's statement is not the legal cause of the plaintiffs' ultimate pecuniary loss.

BP is incorrect. Ron Benhart's statements to the Overland police initiated the criminal investigation and, ultimately, the indictment of Wandersee, events which resulted in pecuniary loss to plaintiffs. As a catalyst for the events that resulted in the pecuniary loss, the jury could conclude that Benhart's false statement was a "substantial factor" in bringing about the loss.

### (3) Jury Instruction on Burden of Proof

 Did the trial court commit reversible error, as BP asserts, by submitting a modified form of Missouri Approved Jury Instruction 3.05 to the jury?

MAI 3.05 describes the burden of proof in libel and slander cases. When submitted to a jury, it provides, in pertinent part, that "[i]n these instructions, you are told that your verdict depends on whether or not you believe certain propositions of fact submitted to you. The burden is upon plaintiff to cause you to believe that the

evidence has clearly and convincingly established that the [statement] referred to in the evidence was false and that defendant [made the statement] with knowledge that it was false or with reckless disregard for whether it was true or false *at a time when defendant had serious doubt as to whether it was true."* MAI 3.05 (emphasis added).

Because a claim for injurious falsehood, like a claim for libel or slander, requires proof that the defendant acted knowingly or with reckless disregard for the truth or falsity of the statement at issue, MAI 3.05 may be submitted to the jury in a trial for injurious falsehood. Rest.2d of Torts at § 623A.

Here, the trial court submitted a modified form of MAI 3.05 to the jury as the burden of proof instruction for plaintiffs' claim of injurious falsehood. The trial court modified the MAI instruction by removing the phrase *"at a time when defendant had serious doubt as to whether it was true."* BP argues that deletion of this phrase—the phrase that defines "reckless disregard"—warrants reversal.

Rule 70.02(b) provides that:

Whenever Missouri Approved Instructions contains an instruction applicable in a particular case that the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other instructions on the same subject. Where an MAI must be modified to fairly submit the issues in a particular case, or where there is no applicable MAI so that an instruction not in MAI must be given, then such modifications or such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts. Where there is deviation from an applicable MAI in-

struction which does not need modification under the facts in the particular case, prejudicial error will be presumed unless it is made perfectly clear by the proponent of the instruction that no prejudice could have resulted from such deviation.

■ The MAI contains no burden of proof instruction tailored specifically to claims of injurious falsehood. Although not expressly labeled as such, BP argues that MAI 3.05 is nevertheless "applicable" because the burdens of proof required to sustain claims of both injurious falsehood and defamation brought by a public figure are the same. BP is correct. The elements of both injurious falsehood and defamation of public figures (to which MAI 3.05 expressly applies) require a plaintiff to prove by clear and convincing evidence that the statement at issue is false. The test for whether a defendant had the requisite knowledge of a statement's falsity is also the same—both require the jury to find, by clear and convincing evidence, that the defendant made the statement with the knowledge that the statement at issue was false or that the defendant acted with reckless disregard for its truth or falsity. Rest.2d of Torts § 623A; *Annbar* at 707. *Smith v. UAW–CIO Federal Credit Union,* 728 S.W.2d 679, 684 (Mo.App.1987) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Reckless disregard exists when there is "a high degree of awareness of . . . probable falseness" of the statement or there are "serious doubts as to [its] truth." Rest.2d of Torts § 580.

MAI 3.05, by its express terms, describes the requisite burden of proof in a defamation claim brought by a public figure. Because the burden in an injurious falsehood claim is the same as the burden in a public figure defamation claim, a modification of MAI 3.05 "under the facts in the particular case" was unnecessary. *Means v. Sears, Roebuck & Co.,* 550 S.W.2d 780, 786 (Mo.1977). MAI 3.05 was an "applicable instruction" under 70.02, and the trial court's omission of the definitional phrase "at a time when defendant had serious doubt as to whether it was true" constituted error. *Karashin v. Haggard Hauling & Rigging, Inc.,* 653 S.W.2d 203, 206 (Mo. banc 1983) ("Where an instruction includes a term or phrase defined by MAI, it is error not to use the MAI definition.").

To determine whether the trial court's modification of MAI 3.05 constituted reversible error, this Court must evaluate whether the omission of the definitional phrase resulted in prejudice to BP. *Hudson v. Carr,* 668 S.W.2d 68, 71 (Mo. banc 1984). BP fails to demonstrate prejudice as a result of the trial court's erroneous modification of MAI 3.05. As discussed above, there is sufficient evidence to prove that BP had *actual* knowledge of the theft allegation's falsity—that BP, based on the information in its records and the knowledge of several of its agents, knew the theft allegation was false at the time Benhart reported it to police. Because its liability is independently based upon BP's *actual knowledge* of the statement's falsity, the omission of the phrase defining the standard for reckless disregard was not prejudicial. As such, the trial court's instructional error cannot be a basis for reversal.

### (4) Qualified Privilege

■ Did the trial court err in overruling BP's motion for a new trial because the court failed to instruct the jury on the qualified privilege applicable to the plaintiffs' injurious falsehood claim?

In the context of a claim for injurious falsehood, "[a] rival claimant is conditionally privileged to disparage another's prop-

erty in land, chattels or intangible things by an assertion of an inconsistent legally protected interest in himself." Rest.2d of Torts at § 647. This qualified privilege "permits the publisher to assert a claim to a legally protected interest of his own provided that the assertion is honest and in good faith, even though his belief is neither correct nor reasonable."[4] *Id.* at cmt. b.

The phrase "good faith" encompasses a "freedom from knowledge of circumstances which ought to put the holder upon inquiry." BLACK'S LAW DICTIONARY 693 (6th ed.1990). Thus, by definition, a defendant in an injurious falsehood case who *knowingly* publishes a false statement does not act in good faith and cannot, therefore, utilize this qualified privilege to escape liability.

There is insufficient evidence in this case to support a finding that BP acted without knowledge when it made the false allegation of theft. As such, the qualified privilege is not applicable. The trial court did not err in overruling BP's motion for a new trial on this ground.

### (5) Damages

Did the trial court err or abuse its discretion, as BP argues, by permitting the jury to award damages for lost profits, foregone wages, and attorneys' fees?

### (a) Lost Profits

 Did the trial court err in admitting evidence of ACT's lost profits and in submitting lost profits to the jury as a measure of damages?

 "In evaluating the sufficiency of evidence to sustain awards of damages for loss of business profits the appellate courts of this state have made stringent requirements, refusing to permit speculation as to probable or expected profits, and requiring a substantial basis for such awards." *Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.,* 155 S.W.3d 50, 54 (Mo. banc 2005) (citing *Coonis v. Rogers,* 429 S.W.2d 709, 713–14 (Mo. banc 1968)). For an award of lost profits damages, a party must produce evidence that provides an adequate basis for estimating the lost profits with reasonable certainty. *Id.* (citing *Meridian Enters. Corp. v. KCBS, Inc.,* 910 S.W.2d 329, 331 (Mo.App. 1995)). To create an adequate basis for an award of lost profits, a plaintiff must provide evidence of the income and expenses of the business for a reasonable time before the interruption caused by defendant's actions, with a consequent establishing of the net profits during the previous period. *Coonis* at 714. While an estimate of prospective or anticipated profits must rest upon more than mere speculation, "[u]ncertainty as to the amount of profits that would have been made does not prevent a recovery." *Ameristar* at 55. (quoting *Gasser v. John Knox Village,* 761 S.W.2d 728, 734 (Mo.App.1988)).

At trial, Wandersee and ACT presented evidence that BP's false allegation of theft resulted in $192,610 of recoverable lost profits. The plaintiffs based this lost profits projection on ACT's income tax return

---

4. The conditional privilege applicable to claims of injurious falsehood differs from the conditional privilege applicable to claims of defamation. In the defamation context, the publisher of a defamatory statement may only assert the privilege "if the circumstances induce *a correct or reasonable belief* that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest." Rest.2d of Torts at § 594. (emphasis added). To successfully assert the privilege in the injurious falsehood context, however, the publisher need only show that he made the assertion honestly and in good faith "even though his belief is neither correct nor reasonable." *Id.* at § 647.

for fiscal years 1996 through 1998, which showed a 25.5 percent growth rate for gross sales and an average "net profit margin" of 5.5 percent during those years. Plaintiffs applied those percentages to ACT's income tax returns for 1999, 2000 and 2001 to determine that ACT sustained $192,610 in lost profits during the years following BP's false allegation of theft.

BP argues that, in reaching this figure, plaintiffs failed to "establish proof of the income and expenses of the business for a reasonable time anterior to the interruption." *Coonis* at 714. BP points out that the income tax returns from 1996 through 1998 include only ACT's income and expenses until September 30, 1998. The "interruption of business"—that is, BP's false allegation of theft—occurred on July 26, 1999. Because the tax returns do not include the ten months immediately preceding the allegation, BP argues that the plaintiffs' failed to provide income and expense information for the requisite reasonable time before the interruption.

BP's contention is unpersuasive. The $192,610 award for lost profits was based on ACT's income tax return from the three fiscal years preceding the theft allegation. While there is a gap in showing income on the tax returns, there is no support for BP's assertion that three years of income tax returns are "inadequate as a matter of law" due to this gap. ACT also presented testimony that explained why there were not separate figures for the partial year between the dates covered by the tax returns and the injury, and offered testimony that the business had continued to make profits and offered his opinion, based on the trend established for prior years, as

to what his profits would have been absent the wrong.

BP also argues that this evidence failed to eliminate other potential causes for the lost profits. BP correctly notes that "[r]ecovery for lost profits is not permitted when uncertainty and speculation exist as to whether lost profits would have occurred or whether lost profits emanated from the wrong." *Anuhco, Inc. v. Westinghouse Credit Corp.*, 883 S.W.2d 910, 923 (Mo.App.1994). At trial, Wandersee testified that BP's false theft allegation was the only possible cause of ACT's decrease in profits. BP asserts that Wandersee's testimony is self-serving and provided an insufficient basis to support a jury finding that BP's action had caused the lost profits.[5] Beyond references to "general decline in the market" and "new competition", however, BP fails to identify any evidence that would compel the jury to agree with its contention that the lost profits emanated from something other than the false theft allegation. The jury was free to accept ACT's factual theory and reject BP's. BP's motion for a new trial was properly overruled.

### (b) Foregone Wages

█ Did the trial court err in allowing the jury to consider forgone wages of four ACT employees in its calculation of damages? ACT presented evidence that, due to the economic impact of BP's false statement, ACT was unable to pay the wages of employees Brian Wandersee, Laura Wandersee, Jane Wandersee and Herb Wandersee from August 1999 through 2001. At trial, plaintiffs sought $365,000 in "foregone wages" for these employees.

---

5. BP had the opportunity to cross-examine Wandersee at trial. BP also called its own expert witness, an accountant certified in business valuation, to testify about the "industry pitfall" occurring in the general market during the time period for which plaintiffs were seeking lost profits.

■ The goal of awarding damages is to compensate a party for a legally recognized loss. *Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. banc 2005) (citing *De Salme v. Union Elec. Light & Power Co.*, 232 Mo.App. 245, 102 S.W.2d 779, 782 (1937)). To warrant the recovery of damages, there must be both a right of action for a legal wrong inflicted by the defendant and damage resulting to the plaintiff therefrom. AM.JUR.2D *Damages* § 4 (2008). A party should be fully compensated for its loss, but not recover a windfall. *Id.* (citing *Weeks–Maxwell Constr. Co. v. Belger Cartage Serv., Inc.*, 409 S.W.2d 792, 796 (Mo.App.1966)).

Although characterized by the parties as damages for "foregone wages", the $365,000 award did not compensate ACT for payment of its employees' salaries. The function of the award was to adjust the projected lost profits figure to reflect ACT's actual loss of profits. As both parties acknowledge, the projected lost profits figure of $192,610 was based on a comparison of ACT's income tax returns from the years before and after BP's allegation of theft. Based on the tax returns from 1996 through 1998, plaintiffs calculated a growth rate of 25.5 percent and an average net profit margin of 5.5 percent. When applied to the income reflected in ACT's 1999, 2000 and 2001, these percentages indicate that ACT suffered $192,610 in lost profits due to BP's conduct. This figure does not provide a complete picture of the lost profits resulting from the false allegation of theft, however. During 1999, 2000 and 2001, ACT elected not to pay the salaries of four of its employees due to economic hardship. As such, the tax returns from these years do not reflect the expense of these salaries which, although deferred, ACT is still obliged to pay. The jury could properly conclude that, in order to reflect ACT's *actual* loss in profits, the

$365,000 expense of the deferred salaries had to be added to the $192,610 lost profits calculation (which was derived without consideration of the additional expense of the salaries).

Because the award of $365,000 was an adjustment that the jury could conclude was necessary to compensate the plaintiffs for ACT's actual loss in profits, it was a valid measure of damages. The trial court correctly overruled BP's motion for a new trial on this ground.

### (c) Steve Amick's Attorneys' Fees

■ BP also argues that the trial court abused its discretion by admitting testimony regarding Steve Amick's attorneys' fees and ultimately permitting the jury to award $25,000 for Amick's attorneys' fees. BP argues that there is insufficient evidence to support the contention that plaintiffs are entitled to a damage award for Amick's attorneys' fees. Plaintiffs presented the testimony of Wandersee, Amick himself and Amick's criminal defense attorney in support of their contention that Amick, who was an employee of plaintiff ACT at the time of the theft allegation, incurred attorneys' fees as a result of defendant's conduct. BP did not object to the testimony regarding Amick's legal fees. ACT also produced evidence that it had agreed to reimburse attorneys' fees for Amick, who was not a party to the lawsuit. There was sufficient evidence to support awarding $25,000 to ACT for Amick's fees.

### (d) Damages Sustained after the year 2000

BP argues that the trial court should have severed plaintiffs' damages at the fiscal year 2000. BP argues that its conduct was not the legal cause of the damages that resulted from the prosecutor's

indictment of Wandersee. As discussed above, there is sufficient evidence to support the jury's conclusion that BP's false statement was a cause of the indictment and the damages resulting therefrom. The trial court did not err in refusing to limit the jury's award to damages sustained prior to the beginning of 2001.

### (6) Remittitur

In its final point, BP argues that the jury's award of damages, which totaled $605,350.00, "exceeds fair and reasonable compensation for plaintiff's injuries and damages." Section 537.068. Thus, BP argues that the trial court erred in overruling its motion for an order of remittitur under section 537.068.[6] Section 537.068 provides that a "court may enter a remittitur order if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages...."

After reviewing the record, this Court finds no basis for concluding that the trial court abused its discretion in overruling BP's motion for remittitur.

### Conclusion

The trial court correctly denied BP's motions for judgment notwithstanding the verdict and for new trial. The court did not abuse its discretion in overruling the motion for remittitur.

The judgment of the trial court is affirmed.

All concur.

---

6. All statutory references are to RSMo 2000.