# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1451

_____

Nitro Distributing, Inc.; West Palm    *
Convention Services, Inc.; Netco, Inc.;    *
Schmitz & Associates, Inc.;    *
U-Can-II, Inc.,    *
   *
        Appellants,    *
   *   Appeal from the United States
    v.    *   District Court for the
   *   Western District of Missouri.
Alticor, Inc., a foreign corporation;    *
Amway Corporation, a foreign    *
corporation; Quixtar, Inc., a foreign    *
corporation,    *
   *
        Appellees.    *

_____

Submitted: January 14, 2009
Filed: May 4, 2009

_____

Before LOKEN, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Nitro Distributing, Inc., West Palm Convention Services, Inc., Netco, Inc., Schmitz & Associates, Inc., and U-Can-II, Inc., (collectively, appellants), appeal from

the district court's[1] grant of summary judgment to Alticor, Inc., Amway Corporation, and Quixtar, Inc., (collectively, Amway); dismissal of appellants' Racketeer Influenced and Corrupt Organizations Act (RICO) claims; and various adverse discovery rulings. We affirm.

I.

Appellants were each distributors of Amway marketing materials. In an earlier decision involving these parties, we explained Amway's unique business model.

> Amway, a multinational company with sales in excess of $5 billion, sells a wide variety of products ranging from kitchen cleaner to jewelry to, in some countries, coffee and milk. . . . Amway distributes its products via a "network marketing" method. Under this method, a potential distributor must be sponsored into the company before he or she may sell Amway products. The sponsor, the sponsor's sponsor, and so on, are the "upline" for the new distributor. Amway encourages distributors to establish a "downline" by sponsoring other distributors, and it awards bonuses based on the volume of both the distributors' sales and the sales of their downline. Amway calls this system the "products business".

> Sponsors use motivational tools like tapes, lectures, and rallies, [or business support materials (BSMs)], to recruit new distributors and to encourage their downlines to sell as many products as possible. The "tools business" arose to meet the demand for motivational tools.

Nitro Distrib., Inc. v. Alticor, Inc., 453 F.3d 995, 997 (8th Cir. 2006). The tools business operates in largely the same manner as the products business in that there are lines of sponsorship and each distributor develops a downline. In both businesses, sponsors are not to solicit another sponsor's downline; a sponsor typically sells

---

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

-2-

products to his own downline, and downlines generally buy their sponsor's products. Additionally many of the companies in the tools business are owned by individuals in the products business.

Until 1998, Dexter Yager headed the largest line of sponsorship in the tools business. Dexter Yager had long been one of Amway's largest distributors, and he also owns InterNET, the exclusive supplier of BSMs to all distributors in his downline. His son, Jeff Yager, is president of InterNET. In 1997, four members of Dexter Yager's downline—Hal Gooch, Bill Childers, Tim Foley, and Steve Woods (the founders)—decided they wanted to break away from InterNET and form their own BSM distribution system, which would become Pro Net. Ken Stewart, the owner of appellants Nitro and West Palm, chose to join this breakaway and Pro Net. Global Support Services (Global) became Pro Net's exclusive supplier of BSMs. Appellants were high-ranking downline distributors in the founders' and Dexter Yager's lines of sponsorship.

The founders contacted Amway to discuss their desire to separate from InterNET. Amway is accustomed to such separations and says that it often offers advice to assure a smooth transition and avoid disruption of its products business. Sharon Grider, Amway's in-house counsel, and Bob Kerkstra, Amway's Manager of Distributor Relations, expressed concern to the founders that the breakaway would be contentious. Grider agreed to provide assistance to the founders, which included model BSM contracts and the Amway Antitrust Primer. The primer warned that "[c]ompeting BSM sellers, including those involved in customer disputes, must not agree to divide up customers and revenue," but that "it may be appropriate to agree on how to separate BSM lines of sponsorship to resolve a dispute." The primer also recommended that the founders seek independent legal advice.

Unattributed handwritten notes suggest that an Amway Steering Committee was formed to "manage" the breakaway.[2] According to these notes, Committee members included Kerkstra, Doug DeVos, other high-level Amway executives, and Bill Zeoli, who had previously worked as an outside consultant on Amway's behalf. The notes indicate that Amway would not take sides and that its primary concerns were to "1. protect the little guy, 2. maintain tool income for those who depend, and 3. [make sure that] Amway revenue will not suffer." These notes and the record as a whole suggest that Amway's primary focus was on avoiding a negative impact on its products distribution business.

The founders asked Zeoli for his assistance in negotiating the breakaway and considered him to be a neutral mediator. In July 1997, Zeoli left a voice message for the founders "to report on the responsibility assignment you have given me." Zeoli explained in the message that DeVos would not be involved in these negotiations, but that Kerkstra would be involved because he was "the authority over the rules and regulations." The purpose of the message was to notify the founders that Jeff Yager was willing to have a "non-war" meeting with them. Zeoli also suggested that the founders pay Dexter Yager a percentage of each tape sold by Pro Net, assuming that neither group's downlines were "raided" by the other.

Early in 1998, the parties had many meetings to facilitate the breakaway. Kerkstra remembers attending several meetings with both Dexter and Jeff Yager and the founders "to avoid injuring as many distributors involved as possible." Kerkstra also acknowledged that if pricing was discussed at the meetings, he would have been there to hear it, but stated that Amway would not discuss specific pricing regarding a non-Amway product, such as InterNET's and Pro Net's BSMs. Gooch also

---

[2]It is unclear who wrote these notes and appellants have offered no record citation of their authentication.

remembered that BSM pricing and a payment to Dexter Yager were discussed at these meetings, but offered no further specifics.[3]

During this period of negotiation, the founders sought and received confidential "pin level" and line of sponsorship information from Amway. Pin levels are a means of distinguishing top earners within a line of sponsorship. The founders requested this information to create a compensation plan for Pro Net that accurately reflected the productivity of each distributor within their lines of sponsorship.

A sticking point between the parties was the tools created by InterNET that featured founders, such as motivational audio tapes on which a founder was the primary speaker. The founders argued that these tapes were their property and should be given to them upon breaking away from InterNET. InterNET, and thereby Jeff and Dexter Yager, insisted, however, that "[i]t has been the understanding of the entire organization that in exchange for InterNET recording, editing, marketing, manufacturing, and distributing [the tapes] in single quantities that we own and supply this material." The parties eventually agreed that InterNET would supply the master versions of the tapes on condition that Pro Net pay a royalty fee of $.14 per tape to InterNET. Additionally, each side agreed not to solicit the other's downlines. The royalty payments continued through 2000 and totaled just over $1 million.

The formation of Pro Net had negative consequences for appellants. Though the parties disagree as to the direct cause, appellants experienced decreased sales and market share, and, in some cases, the failure of their business after Pro Net's formation. Appellants filed suit against Amway, alleging that Amway and Pro Net, and at times, InterNET, were involved in an antitrust conspiracy. Appellants asserted that Pro Net was a sham corporation organized to allow Amway to gain greater control over the BSM market. According to appellants, Amway and Pro Net

---

[3]Founder Childers had no recollection of Amway's involvement in negotiating the breakaway from InterNET.

conspired to allocate customers and fix prices within the tools business in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. Appellants also alleged injurious falsehood, tortious interference, and violations of RICO, 18 U.S.C. § 1962.

## II.

The district court granted summary judgment to Amway, dismissing appellants' claims of antitrust conspiracy, injurious falsehood, and tortious interference. We review a district court's grant of summary judgment *de novo*, Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1489 (8th Cir. 1992), and view the evidence in the light most favorable to the nonmovant. Flegel v. Christian Hosp. Northeast-Northwest, 4 F.3d 682, 685 (8th Cir. 1993). To survive a motion for summary judgment, appellants "must establish that there is a genuine issue of material fact" such that their claim should proceed to trial. Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). This standard requires more than "some metaphysical doubt as to the material facts." Id. at 587. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id.

## A.

Appellants argue that the district court "misunderstood the nature and scope of the conspiracy" when it granted summary judgment to Amway on appellants' antitrust claims. Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. See also, Blomkest Fertilizers, Inc., v. Potash Corp. of Saskatchewan, Inc., 203 F.3d 1028, 1032 (8th Cir. 2000) (en banc) ("Section 1 prohibits concerted action by two or more parties in the restraint of trade."). "[I]t was intended to prohibit only unreasonable restraints of trade." Bus. Elecs. Corp. v. Sharp Elec. Corp., 485 U.S. 717, 723 (1988) (citing Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85,

-6-

98 (1984)). Appellants' claims of price-fixing and customer allocation agreements are among the "most elementary" violations. Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 782 (7th Cir. 1994), and are generally subject to a *per se* analysis. Id. (citing Palmer v. BRG of Georgia, Inc., 498 U.S. 46 (1990)). "If an alleged restraint falls within the category of restraints subject to *per se* analysis, a plaintiff need not prove its anticompetitive effects." Flegel, 4 F.3d at 686 (emphasis added).

We conclude that appellants' claims of antitrust conspiracy were appropriately dismissed. The record shows that appellants failed to exclude the possibility of independent action, have attempted to characterize vertical constraints as a horizontal restraint conspiracy, and have set forth factual allegations that do not demonstrate the existence of any unlawful restraint of trade.

1.

Even in *per se* cases, "antitrust law limits the range of permissible inference from ambiguous evidence in a § 1 case." Matsushita, 475 U.S. at 588. Thus, a party seeking damages for a § 1 violation must present evidence that "tends to exclude the possibility of independent action" by the alleged co-conspirators. Monsanto Co. v. Spray-Right Servs. Corp., 465 U.S. 752, 768 (1984). "Independent action is not proscribed." Id. at 760. "This means that conduct that is 'as consistent with permissible [activity] as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.'" Blomkest Fertilizers, Inc., 203 F.3d at 1032 (citing Matsushita, 475 U.S. 574, 588 (1986)).

Appellants argue that they are not required to disprove independent action because they have provided direct evidence of Amway's involvement in an unlawful conspiracy. They contend that the requirement that independent action be excluded is limited to cases in which the plaintiff relies solely on circumstantial evidence. Rossi v. Standard Roofing, 156 F.3d 452, 466 (3d Cir. 1998) ("Under our jurisprudence, the Matsushita standard only applies when the plaintiff has failed to put

-7-

forth direct evidence of conspiracy."); <u>Williamson Oil Co. v. Philip Morris USA</u>, 346 F.3d 1287, 1300 (11th Cir. 2003) (appearing to single out circumstantial evidence for the requirement that independent action be excluded as a possibility).

We apply <u>Monsanto</u> and <u>Matsushita</u> broadly, <u>Blomkest</u>, 203 F.3d at 1032, and have not made such a distinction; we require a showing of independent action, whether it be by circumstantial or direct evidence. <u>See</u> <u>Craftsmen Limousine, Inc. v. Ford Motor Co.</u>, 363 F.3d 761, 771 (8th Cir. 2004) ("Although it may be in the form of circumstantial evidence, a plaintiff must present some evidence that tends 'to exclude the possibility that the alleged coconspirators acted independently.'"). <u>Monsanto</u> recognizes that either direct or circumstantial evidence may satisfy this requirement. 465 U.S. at 764. Although the presentation of direct evidence of an unlawful conspiracy will likely preclude a lawful explanation, it does not follow that the possibility of independent action need not be excluded when direct evidence is provided.

Despite appellants' claims of direct evidence of a conspiracy, the record suggests independent action by Amway. As the district court found, Amway was likely involved in the breakaway for the primary purpose of protecting its products business and perhaps secondarily as a means of limiting Dexter Yager's influence over its products business—both of which are admittedly lawful aims. Much of the evidence presented by appellants as support for their conspiracy theory in fact supports Amway's independent role. The antitrust primer, legal assistance, model contracts, and suggestions that Pro Net seek outside counsel (which it did) all imply that Amway was interested in Pro Net setting up a legitimate and sustainable enterprise. Although appellants attempt to attach a sinister motive to Kerkstra's involvement, it appears that he was involved to ensure that Amway's rules were followed. That Amway was interested in keeping the peace or, as appellants stress, avoiding a war, does not necessitate the finding of the use of unlawful means. If Pro Net was involved in unlawful activities or was even an unlawful enterprise in itself,

no evidence presented suggests that Amway was aware of this illegality, let alone acting with Pro Net to this end.

Appellants acknowledge that Amway was motivated by its desire to protect its products business and weaken Dexter Yager's control, but they argue that Amway's motivation to join the conspiracy should not be confused with the focus of the conspiracy itself, which was "to maintain control over the segment of the BSM industry in the Pro Net Founders' Line of Affiliation." Appellants theory, however, requires the court to assume the existence of an illegal conspiracy and to then view the facts in light of this understanding, an impermissible question-begging procedural gambit on appellants' part. Blomkest, 203 F.3d at 1033. A more natural reading of the facts is that Amway was not only motivated by the desire to protect its products business, but that peaceful resolution of a contentious breakaway was in fact the end Amway sought.

2.

More importantly, the role Amway played in this separation was not as a horizontal competitor, but as a vertical quasi-parent company interested in the survival of its primary business. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." Bus. Elecs. Corp., 485 U.S. at 730. For appellants to succeed in their claims of *per se* antitrust violations, they must show that Amway was in direct competition with Pro Net and InterNET and that it was taking steps with its co-conspirators to restrain trade. See ES Dev. Inc. v. RWM Enters., Inc., 939 F.2d 547, 556 (8th Cir. 1991) ("The classic form of a per se § 1 Sherman Act violation is a combination, conspiracy or agreement between competitors at the same level of the market to restrain competition; the so-called 'horizontal' restraint of trade.").

In an attempt to establish the existence of a horizontal relationship, appellants put significant weight on our earlier decision that recognized that Amway has its own tool business. See Nitro Distrib., Inc. v. Alticor, Inc., 453 F.3d at 997. Amway's tool business, however, is limited to books written by Amway's creators, general marketing material, and free conventions for Amway distributors. It is a small fraction of Amway's overall business and does not meaningfully compete with companies like InterNET and Pro Net, and appellants' evidence does nothing to suggest otherwise. Similarly, appellants provide no factual support for their assertion that Pro Net was organized as a sham corporation through which Amway could sell BSMs. Once again, appellants' theories are cognizable only if a conspiracy is assumed. Without this assumption, Amway's motivations and actions are all vertical—between quasi-parent company and distributor, not horizontal competitors. Vertical nonprice restraints are not *per se* illegal. Bus. Elecs. Corp., 485 U.S. at 724 (quoting Cont'l T.V., Inc., v. GTE Sylvania Inc., 433 U.S. 36, 58 (1977)).

3.

Stripping appellants' argument of the assumptions necessary for its support further reveals that appellants' evidence does not connect Amway with any unlawful restraint of trade. Although appellants have shown that Amway was involved in the breakaway, there is no evidence that the breakaway itself was unlawful. Appellants ascribe three unlawful components to the breakaway: a "pay-off" tied to a customer allocation agreement, price-fixing, and Pro-Net's inherent illegality. We address each of these in turn.

What appellants have labeled a "pay-off" is described throughout the record as a royalty fee from Pro-Net to InterNET for Pro-Net's use and reproduction of the tapes originally produced by InterNET. Other than substituting "pay-off" for "royalty fee," appellants have provided no basis for assuming that this payment was anything other than what it purported to be. That the royalty fee was suggested by Zeoli in connection with a non-solicitation agreement does not transform it into an unlawful

bribe.[4]  The parties were involved in contentious negotiations, and making lawful concessions to maintain peaceful business relations does not violate antitrust laws.

Appellants also mischaracterize Pro Net's and InterNET's agreement not to solicit one another's downline.  At the center of the breakaway was a disentanglement of the lines of sponsorship stemming from Dexter Yager on the one hand and the founders on the other.  Without this separation, there could be no breakaway.  Amway's antitrust primer envisions separation of BSM lines of sponsorship as a form of dispute resolution.  And, as stated in appellants' brief, two accepted rules of the BSM industry are that "a distributor should only buy BSMs from, and attend the functions, [sic] of his upline, and . . . a distributor should not sell BSMs to another's downline without the other's consent and without fairly compensating him."  This rule is a reflection of Rule 10(d) of Amway's Rules of Conduct for Amway Distributors.  In essence, Pro Net and InterNET simply agreed to follow these rules and not solicit the other's downline.

This arrangement does not violate § 1.  In <u>In re Amway Corp.</u>, the Federal Trade Commission (FTC) addressed the legality of these rules in Amway's products business.  93 F.T.C. 618 (1979).  The FTC concluded that the line of sponsorship system is vertically imposed and is "reasonably ancillary to compensation, efficient distribution, and training."  <u>Id.</u>  Although Pro Net and InterNET are horizontal competitors, their agreement merely affirmed this vertically imposed system.

---

[4]Appellants stress the fact that the royalty fee and non-solicitation agreement were initially suggested by Zeoli in support of their assertion that Zeoli was acting as an agent for Amway. Zeoli's agency status is unclear.  Although Zeoli had previously worked on Amway's behalf to resolve disputes and is listed as an Amway Steering Committee member on the unattributed Committee notes, it was Pro Net founder Childers who approached Zeoli for help in mediating the separation.  We need not resolve this issue here, however, because Zeoli's proposal neither suggested nor precipitated unlawful activity attributable to Amway.

Appellants also allege that Amway participated in a conspiracy to fix prices. Their purported "direct evidence" of conspiracy is that Kerkstra and Zeoli attended meetings at which BSM pricing was discussed and that Amway provided confidential line of sponsorship information to Pro Net. Kerkstra admitted that he may have attended meetings where pricing was discussed, and a former member of Pro Net testified that Amway was involved in Pro Net and Global's setting of prices. Appellants, however, provide no detail or context to these discussions and instead leave us to speculate as to their possible implications. Some context is provided in Jeff Yager's May 8, 1998, letter to Global and the founders, which recaps a pivotal meeting at which the pricing of BSMs sold by InterNET to Pro Net were discussed. Appellants offer no evidence that anything more sinister than this was discussed with regards to pricing. Without greater detail, appellants' allegations of price-fixing are without merit.

A greater leap of logic must be made in order to infer price-fixing from Amway's disclosure of confidential line of sponsorship information. Appellants themselves testified that this information was used to prepare a compensation plan for Pro Net's line of sponsorship. Their expert explained why this information was valuable to Pro Net in setting their compensation plan. The information detailed the actual, current productivity level of each distributor, while those not privy to this information knew only the highest pin level that had ever been attained by a distributor. With this information, Pro Net was able to compensate a distributor at his current level of productivity rather than at a level that a distributor had previously attained but had not maintained. While it may have been inappropriate for Amway to disclose information it had deemed confidential, the disclosure in no way suggests a conspiracy to fix prices.

Finally, appellants assert that Pro Net was an illegal association. Their argument lacks factual or legal support.[5] Appellants incorrectly equate breakaway with illegal association. Though they have shown that Amway's legal counsel offered assistance with the breakaway, it does not follow that Amway actively participated in the formation of an illegal association or conspiracy.

B.

Appellants argue that the district court erred in placing upon them the burden of showing fraudulent concealment, which resulted in the dismissal of Netco and Schmitz & Associates' antitrust claims as time barred. An antitrust claim "shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. A cause of action accrues "when a defendant commits an act that injures a plaintiff's business." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971). Netco and Schmitz & Associates dissolved on July 21, 1999, and filed this cause of action more than four years later.

In its motion for summary judgment, Amway successfully argued that the statute of limitations period had run. The burden then shifted to appellants to present an issue of material fact showing that Amway had fraudulently concealed the alleged conspiracy from Netco and Schmitz & Associates. See Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1051 (8th Cir. 2000); Tayborn v. Burstein, 748 S.W.2d 824, 826 (Mo. Ct. App. 1988) (noting that nothing in the record supports plaintiff's burden of showing fraudulent concealment and therefore summary judgment to defendant was proper). The moving party does not bear the burden of "showing the absence of a genuine issue of material fact," but instead must show that "there is an absence of evidence to support the nonmoving party's case." Celotex

---

[5]Throughout their brief, appellants' proffered record citations lead us to their own motions filed before the district court. A review of these motions leads us often to exhibits filed with the district court, but not included in the record on appeal.

-13-

Corp. v. Catrett, 477 U.S. 317, 325 (1986). Appellants did not plead fraudulent concealment in their complaint. Accordingly, the district court correctly put the burden on appellants and appellants failed to satisfy that burden.

C.

Appellants argue that their injurious falsehood conspiracy claim should not have been dismissed on summary judgment.

> In a claim for injurious falsehood, one who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

Wandersee v. BP Prods. of N. Am., Inc., 263 S.W.3d 623, 628 (Mo. 2008) (citing State ex rel. BP Prods. of N. Am., Inc. v. Ross, 163 S.W.3d 922, 928 (Mo. 2005) (en banc)) (internal quotations and emphasis omitted).

Appellants alleged in their amended complaint that Amway made the statements giving rise to this claim. In their suggestions in opposition to Amway's motion for summary judgment, appellants for the first time attributed the previously unspecified statements to Amway's alleged co-conspirators, rather than to Amway itself. As the district court ruled, appellants have not shown that a conspiracy existed and therefore cannot hold Amway liable for statements made by alleged co-conspirators. Additionally, the district court correctly held that, having failed to comply with the court's order to provide "information linking specific individuals with specific statements, conduct, or occurrences," appellants would not be permitted to rely upon the belatedly disclosed statements. See Fed. R. Civ. P. 37(c)(1).

-14-

## D.

Appellants argue that the district court erred in dismissing their tortious interference claim. A claim of tortious interference with a contract or business expectancy under Missouri law requires appellants to show: "(1) a contract or valid business expectancy; (2) [Amway's] knowledge of the contract or relationship; (3) a breach induced or caused by [Amway's] intentional interference; (4) absence of justification; and (5) damages." Nazeri v. Missouri Valley Coll., 860 S.W.2d 303, 316 (MO 1993) (citing Cmty. Tile v. Roosevelt Fed. Sav. & Loan, 796 S.W.2d 369, 372 (MO 1990) (en banc)).

Appellants have not shown that Amway lacked justification for its actions. Under Missouri law, "[a] plaintiff has the burden of producing substantial evidence to establish a lack of justification," and further, "[i]f the defendant has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests." Id. at 316-17.

As noted above, Amway had a legitimate economic interest in an orderly breakaway because a disruptive separation within the tools business could have negative ramifications on Amway's closely related products business. Given this interest, appellants bore the additional burden of showing that Amway employed improper means. "[I]mproper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." Id. at 317. Appellants failed to meet this burden. Their allegations of improper means simply recount purported actions taken by Amway that adversely affected them. Such conclusory allegations without explanation of impropriety or an absence of justification do not create material issues of fact.

Appellants argue that the district court erred in dismissing their RICO claim and in not granting them a second extension of time in which to amend their complaint to replead this claim. We review a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) *de novo*, Misischia v. St. John's Mercy Health Sys., 457 F.3d 800, 802 (8th Cir. 2006), and review a denial of an extension of time to amend a pleading for abuse of discretion. See Amrine v. Brooks, 522 F.3d 823, 833 (8th Cir. 2008).

Section 1962 of the RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). A violation of § 1962(c) requires appellants to show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). A pattern is shown through two or more related acts of racketeering activity that "amount to or pose a threat of continued criminal activity." Wisdom v. First Midwest Bank, 167 F.3d 402, (8th Cir. 1999) (quoting United Healthcare Corp., v. Am. Trade Ins. Co., 88 F.3d 563, 571 (8th Cir. 1996)).

Appellants' RICO claim was dismissed without prejudice for failure to set forth the predicate acts of mail and wire fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that a party alleging fraud or mistake "state with particularity the circumstances constituting a fraud or mistake." Fed. R. Civ. P. 9(b); see Murr Plumbing, Inc. v. Scherer Bros. Fin. Srvcs. Co., 48 F.3d 1066, 1069 (8th Cir. 1995) (citing 18 U.S.C. §§ 1341, 1343) (holding that Rule 9(b)'s heightened pleading requirement applies to allegations of mail and wire fraud used as predicate acts for a RICO claim). Appellants' amended complaint alleges in very general terms that Amway engaged in racketeering that "involved the use of the

interstate telephone and the U.S. mails on a number of occasions . . . ." The district court correctly dismissed the claim for lack of particularity.

Following this dismissal, the district court gave appellants until January 15, 2007, to amend their pleading to properly state a RICO claim. The district court later granted an extension to February 5, 2007. On the day their amended complaint was due, however, appellants filed a second motion for an extension of time, this time requesting an extension to July 2007, sixty days prior to the close of discovery. In the alternative, appellants indicated that ten days would be sufficient.

Appellants' contention that additional discovery was necessary to remedy their defective RICO claim is belied by their acknowledgment that a ten-day extension would suffice, which suggests that appellants had adequate information at the time, yet failed to amend their pleadings within the extension allotted. Appellants assumed the risk of waiting until the day their amended complaint was due to request additional time. Additionally, we find unpersuasive appellants' reliance on Abels v. Farmers Commodities Corp., 259 F.3d 910 (8th Cir. 2001), for the proposition that their extension should have been granted so that further discovery could be conducted prior to repleading their RICO claim. As an initial matter, the plaintiffs in Abels provided more detail regarding the alleged mail and wire fraud than appellants provided here. Id., at 918-19. More importantly, the Abels plaintiffs provided this information prior to the commencement of discovery. Id. at 921. As we noted, "a court cannot reasonably expect highly specific allegations before allowing at least a brief discovery period." Id. At the time appellants filed their second motion for an extension of time, however, discovery had been ongoing for five months. Accordingly, the district court did not abuse its discretion in denying the second motion for an extension of time.

IV.

Appellants argue that the district court abused its discretion in denying various discovery requests.  See Pleasants v. Am. Express Co., 541 F.3d 853, 859 (8th Cir. 2008) (standard of review).  Appellants' primary complaint is with the district court's return of eleven boxes of documents produced by William Florence.

Florence, a resident of Georgia, was a former board member of the Independent Business Owners Association International (IBOAI), a trade organization representing Amway products distributors.  On July 17, 2007, appellants subpoenaed documents Florence had in his possession as a result of his position on the IBOAI board.  These documents likely fell within a Michigan state court order requiring Florence to return any confidential documents to the IBOAI.  Because Florence failed to respond to the subpoena, appellants filed a motion to enforce the subpoena in the United States District Court for the Middle District of Georgia.  On November 19, 2007, the Georgia district court ordered production of the documents to the district court, rather than directly to appellants, because "the judge presiding over the underlying action in which these documents may be relevant and for which they have been subpoenaed is in the best position to determine whether the documents should be disclosed."

After conducting an in camera inspection, the district court determined that the documents were "unworkable."  Specifically, the court found that numerous documents were duplicative, privileged, and outside the scope of the pending litigation.  On January 11, 2008, the court returned the documents to the source from which they came and instructed appellants that if they wished to produce these documents they must present them to the court in a more manageable condition.

Appellants issued a second, more narrow subpoena, but by that time the documents had been returned to the IBOAI pursuant to a court order.  Appellants did not subpoena the documents from the IBOAI.  Nor did they file a motion pursuant to

Federal Rule of Civil Procedure 56(f) alerting the district court to their need for further discovery to respond to Amway's motion for summary judgment.

District courts are allowed great latitude in discovery matters. <u>Pleasants</u>, 541 F.3d at 859 (citing <u>Executive Air Taxi Corp. v. City of Bismarck</u>, 518 F.3d 562, 570 (8th Cir. 2008)). The district court did not abuse its discretion in determining that appellants should not have access to numerous unresponsive and privileged documents and that neither the court nor Amway should be responsible for sorting through the eleven boxes. Rather, the court concluded that appellants should seek a more streamlined production.

Contrary to appellants' characterization, the returning of the documents did not amount to a denial of discovery. This is made clear by appellants' subsequent subpoena of the same documents. If appellants required more time to acquire the documents, they were free to file a Rule 56(f) motion. Appellants will not now be heard to claim that these documents "presumptively could have been used to avoid summary judgment." "Unless a party files an affidavit under [Rule] 56(f) showing what facts further discovery may uncover, a district court generally does not abuse its discretion in granting summary judgment on the basis of the record before it." <u>Ballard v. Heineman</u>, 548 F.3d 1132, 1137 (8th Cir. 2008) (citing <u>Nolan v. Thompson</u>, 521 F.3d 983, 986 (8th Cir. 2008)).

We have considered appellants' remaining discovery challenges and conclude that they fail to establish any abuse of discretion by the district court.

The judgment is affirmed.

_____